United States Court of Appeals,

Fifth Circuit.

No. 93-1109.

KANSA REINSURANCE COMPANY, LTD., Plaintiff-Counter Defendant-Appellant,

v.

CONGRESSIONAL MORTGAGE CORPORATION OF TEXAS, et al., Defendants.

UNITED POSTAL SAVINGS & LOAN ASSN., Defendant-Cross Plaintiff Appellant,

v.

STEWART TITLE COMPANY and Stewart Title Guaranty Company, Defendants-Counter-Plaintiffs-Cross-Defendants-Appellees.

May 24, 1994.

Appeals from the United States District Court for the Northern District of Texas.

Before POLITZ, Chief Judge, KING and GARWOOD, Circuit Judges.

KING, Circuit Judge:

Appellants Kansa Reinsurance Company, Ltd. ("Kansa") and United Postal Savings & Loan Association ("United Postal") appeal from the district court's summary adjudication of their claims against defendants Stewart Title Company and Stewart Title Guaranty Company (together referred to as "Stewart"). Finding no error, we affirm.

I. Background

A. The Scheme

In early 1983, a developer known as Tectonic Realty and its affiliate, Prestonwood Green of Dallas, Inc. (together referred to as the "developer"), converted a Dallas apartment complex into the

Prestonwood Green Condominiums, marketing the units to individuals for investment purposes. The developer arranged for Congressional Mortgage Corporation of Texas ("Congressional"), one of the defendants below,[1] to provide financing for the purchase price of the individual units. The terms of the agreement were that Congressional would loan up to 90% of the purchase price of the condominiums, which would be paid directly to the developer. Apparently, however, the developer and the condominium buyers collaterally agreed to an inflated or falsified purchase price and further agreed to share the loan proceeds received by the developer through an illegal kick-back to the buyers. Additionally, the developer, despite representations to the contrary, collected no cash down payments from the unit buyers. Instead, the buyers apparently gave notes for the 10% down payments required by the mortgage company. Eighty-six units were sold according to this scheme, fifteen of which are the subject of the case presented. In each case, the buyer promptly defaulted upon his or her loan from Congressional.

As part of the closing transaction, Congressional contacted Home Guaranty Insurance Company ("HGIC"), a mortgage loan insurer, in order to acquire insurance on the loans.[2] In order to procure

---

[1]Congressional is no longer a party to this suit because it was discharged in bankruptcy during the course of the litigation in the district court.

[2]Since the appeal was filed in this case, HGIC has been acquired by appellant Kansa, which was substituted as a party in the appeal; however, as the events at issue involved only HGIC, we will refer to both Kansa and HGIC as "HGIC."

the insurance, Congressional sent HGIC copies of its loan files on the prospective borrowers and other information relating to the purchase. HGIC did no independent investigation of the borrowers, as it claims is customary in the industry for "review writers," such as itself. Relying upon the documents sent by Congressional, HGIC issued commitments of mortgage insurance to Congressional for the purchases at issue.

B. The Closing Transactions

The unit purchases were closed by Stewart. Many of the investors purchased multiple units which were closed in simultaneous closings. As part of its closing instructions, Congressional directed Stewart to provide, *inter alia,* executed HUD-1 settlement statement forms summarizing the closing transaction. Congressional did not instruct Stewart to verify the payments of earnest money deposits, which were equal to 107 of the purchase price. Nor did it require that Stewart ensure execution of the escrow agreement. Instead, Congressional provided Stewart with executed Contracts of Sale (the "contracts") and signed Federal National Mortgage Association Affidavits of Purchaser and Vendor (the "FNMA affidavits") showing that the earnest money deposits equal to ten percent of the purchase price had been paid directly to the seller. These documents also specifically recited that no secondary financing had been obtained on the properties and contained an agreement that:

> If this loan exceeds 807 of the appraised value of the purchase price of the property ... no lien or charge upon such property has been given or executed or has been contracted or agreed to be so given or executed by the Property Purchaser to

3

any person, including Property Vendor, except for (1) liens disclosed in [the financial terms portion of the affidavit], or (2) liens or charges which will be discharged from the proceeds of subject mortgage.

As noted above, Congressional had agreed to finance 90% of the purchase price, and so this provision was applicable. As part of the closing instructions, Stewart was directed to notarize the FNMA vendor/purchaser affidavits and return them to Congressional.

At closing, Stewart's escrow agent, Marilyn Baker ("Baker"), finalized the HUD-1 statements, which HGIC and United Postal claim showed that the earnest money deposits had been paid at settlement.[3] Baker followed the closing instructions given by Congressional, including notarizing the FNMA affidavits and issuing checks to HGIC for the mortgage insurance premiums, and returned the documents to Congressional for final review before disbursement of the funds, as she was directed to do. Upon receipt of the documents, Congressional then made the final distribution of funds, executed the final certificates of insurance, and, according to HGIC, submitted the executed certificates and FNMA affidavits to

---

[3]The HUD-1 settlement statements recite that the "[a]mounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)' were paid outside the closing; they are shown here for informational purposes only and are not included in the totals." The HUD-1 statements at issue in the instant case all contain entries in the spaces designated for "amounts paid by or in behalf of buyer: deposit or earnest money" and "reductions in amount due to seller: excess deposit," representing 10% of the contract sales prices without any qualification that these monies were paid outside closing. The earnest money amounts, however, were not included in the totals due from the buyer at settlement. Even more telling is the fact that the earnest money sums were not included in the totals due to the seller at closing, which tends to show that the seller had already received these payments outside of the closing.

4

HGIC.

Prior to closing, the purchasers apparently executed promissory notes in favor of the developer or its subsidiary which operated as second liens. These notes represented the 107 earnest money/downpayments which had never been paid. At various times outside of the closings, Baker was presented with these second lien deeds of trust. Baker testified at her deposition that the sales representatives and borrowers who presented the documents for notarization were also involved with other condominiums in the area which she did not close. Baker notarized the documents, and they were subsequently recorded in March of 1984, several months after the closings (the "second liens").

Shortly after the closings, on December 21, 1983, United Postal purchased sixty-eight of the mortgages from Congressional and succeeded to the mortgage insurance provided by HGIC covering those loans. Subsequently, the buyers mass-defaulted on their first payments due under the mortgages, and United Postal made claims upon HGIC under the policies.

C. The Instant Litigation

HGIC filed suit in the United States District Court for the Northern District of Texas in January of 1986 against Congressional, United Postal, and Stewart, alleging fraud, negligence, negligent misrepresentation, and breach of fiduciary duty based upon the December 1983 closings. HGIC tendered the premiums it had received and sought recission of the mortgage insurance policies issued to Congressional and assigned to United

5

Postal.  Alternatively, HGIC sought compensatory damages from Stewart to the extent HGIC was liable on the policies.

Almost five years later, on October 23, 1990, United Postal filed a cross-claim against Stewart asserting the same causes of action as had HGIC with the addition of a breach of contract claim. United Postal contended that it first learned of the second liens and corresponding lack of down payments during the May 8, 1990, deposition of Baker.  United Postal also claimed that Stewart represented at closing that the purchasers had made a ten percent cash downpayment despite knowledge of the second liens and that United Postal would never have purchased the mortgages had it known about the problems.

Stewart moved to dismiss United Postal's cross-claims as time-barred and for summary judgment on HGIC's claims.  By order entered March 14, 1991, the trial court dismissed United Postal's cross-claims as being barred by limitations (the "March 14 Dismissal").  On June 4, 1992, the court below entered an interlocutory summary judgment in favor of Stewart on HGIC's claims (the "June 4 Order").  In doing so, the court concluded that (i) HGIC's negligent misrepresentation claim was subject to a two-year statute of limitations which had passed prior to its commencement of this action, and (ii) its summary judgment evidence respecting its fraud claim failed to create a triable issue of fact since there was no evidence that Stewart had knowledge of the false representations or that it made any misrepresentations with an intent to deceive.

6

HGIC and United Postal settled their claims against one another as reflected in the January 5, 1993, agreed order, and the district court entered a final judgment on the same day. United Postal and HGIC took separate appeals from the rendition of judgment against them disposing of their claims against Stewart.

## II. Analysis

### A. Dismissal Of United Postal's Cross-Claim

In dismissing United Postal's cross-claim, the district court determined that (i) the pleading did not "relate back" to the filing of United Postal's original answer and (ii) United Postal's claims accrued at the latest by March 15, 1984, and consequently, the applicable statutes of limitations had run before it filed its cross-claim in October of 1990. United Postal challenges each of these findings on appeal.

### 1. Standard of review

In reviewing the district court's dismissal of United Postal's cross-claim, we accept all factual allegations made in the pleading as true and ask whether, under the circumstances asserted, the allegations state a claim sufficient to avoid dismissal. *See, e.g., United States v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267, 1276, 113 L.Ed.2d 335 (1991); *Berkovitz v. United States,* 486 U.S. 531, 540, 108 S.Ct. 1954, 1960-61, 100 L.Ed.2d 531 (1988). "[W]e may uphold ... [a Rule 12(b)(6) dismissal] only if it appears that no relief could be granted under any set of facts that could be proved consistent with the allegations." *American Waste & Pollution Control Co. v. Browning-Ferris, Inc.,* 949 F.2d 1384, 1386

7

(5th Cir.1991) (quoting *Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.,* 804 F.2d 879, 881 (5th Cir.1986)). While the district court must accept as true all factual allegations in the complaint, *Clark v. Amoco Prod. Co.,* 794 F.2d 967, 970 (5th Cir.1986), it need not resolve unclear questions of law in favor of the plaintiff. *Bane v. Ferguson,* 890 F.2d 11, 13 (7th Cir.1989). Moreover, when a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate. *Clark,* 794 F.2d at 970.

2. "Relation back" of United Postal's cross-claim

Federal Rule of Civil Procedure 15(c) is a procedural provision to allow a party to amend an operative pleading despite an applicable statute of limitations in situations where the parties to litigation have been sufficiently put on notice of facts and claims which may give rise to future, related claims.[4] The rationale of the rule is that, once litigation involving a particular transaction has been instituted, the parties should not be protected by a statute of limitations from later asserted claims that arose out of the same conduct set forth in the original pleadings. 6A CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1496 (1990). Rule 15(c) provides, in relevant part, that:

Whenever the claim or defense asserted in the amended pleading

---

[4]Rule 15(c)'s relation back doctrine, though it has the ultimate effect of "tolling" limitations, is considered by this court to be purely procedural and is thus governed by federal law. *See, e.g., Hensgens v. Deere & Co.,* 869 F.2d 879, 880 (5th Cir.), *cert. denied,* 493 U.S. 851, 110 S.Ct. 150, 107 L.Ed.2d 108 (1989) ("[F]ederal law regarding relation back of amendments to pleadings is controlling in diversity cases in federal court.").

8

> arose out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

FED.R.CIV.P. 15(c). This so-called "relation back" doctrine "does not extend the limitations period, but merely recognizes that the purposes of the statute are accomplished by the filing of the initial pleading." *American Tel. & Tel. Co. v. Delta Communications Corp.,* 114 F.R.D. 606, 612 (S.D.Miss.1986).

As the district court observed, "[t]he necessary implication of the rule is that in order for an amended pleading to relate back for statute of limitations purposes, there must be a previous pleading to which the amendment dates back." It concluded that no such pleading existed. United Postal argues on appeal that the cross-claim related back to either HGIC's original complaint or to its April 18, 1989, amended answer and counterclaim (the "amended answer"). The cross-claim filed by United Postal is, however, an "original" cross-claim against a co-party, *not* an amendment to a previously filed pleading. Accordingly, it does not appear to be within the province of Rule 15(c). Furthermore, Rule 13(g) governing cross-claims does not permit relation back of a cross-claim seeking affirmative and independent relief to the original complaint. *See United States for the use of Bros. Builders Supply Co. v. Old World Artisans, Inc.,* 702 F.Supp. 1561, 1569 (N.D.Ga.1988) (noting that the common law rule that "statutes of limitations do not run against pure defenses does not apply to setoffs, counterclaims or crossclaims that are affirmative, independent causes of action").

9

United Postal relies heavily upon an unpublished opinion from the Southern District of New York, *Hemmerick v. Chrysler Corp.,* 1989 WL 4493 (S.D.N.Y. Jan. 13, 1989), in which the court allowed a plaintiff to amend his original complaint to assert an otherwise untimely cross-claim against his co-plaintiff. Pertinent to that case was the fact that both co-plaintiffs had been previously represented by the same counsel and that the cross-plaintiff sought to assert the cross-claim only after retaining independent counsel. In the instant case, by contrast, Stewart and United Postal have been represented by independent counsel with no potential conflict which would prevent United Postal from asserting the cross-claim. We are not persuaded that the *Hemmerick* result would be proper under the circumstances of this case.

United Postal alternatively argues that its amended answer is the relevant pleading to which we look for Rule 15(c) purposes and argues that this answer was effectively amended by the cross-claim; thus, it concludes, the cross-claim "relates back" to April 18, 1989. We disagree. The cross-claim does not amend the answer because it does not contain any of the allegations in either the amended answer or the counterclaim; rather, it stands alone. Moreover, the amended answer was a responsive pleading which did not assert—or even intimate—any allegations of wrongdoing against Stewart even though all the facts necessary to give rise to such allegations were present in HGIC's original complaint. In fact, the counterclaim did not even mention Stewart. Further, the counterclaim contained in the amended answer was aimed solely

10

against HGIC and cannot be viewed as having put Stewart on notice that United Postal sought relief against Stewart. *See Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 149-50 n. 3, 104 S.Ct. 1723, 1724-25 n. 3, 80 L.Ed.2d 196 (1984) (holding that Rule 15(c) was designed to allow parties to present untimely claims based upon the same transaction so long as it would not work unfair surprise or prejudice). Stewart was not put on notice by the amended answer that it might have to satisfy *two* separate potential judgments.[5] *O'Loughlin v. National R.R. Passenger Corp.,* 928 F.2d 24, 26-27 (1st Cir.1991) (refusing to allow an amendment to relate back to the original pleading which asserts claims not even suggested in the original).

The case presented is not one of joint and several liability where Stewart would at least be aware of the potential of a contribution or indemnification cross-claim by United Postal. *See, e.g., B.S. Livingston Export Corp. v. M/V Ogden Fraser,* 727 F.Supp. 144 (S.D.N.Y.1989) (allowing amendment to assert cross-claim for indemnification of damages plaintiff might potentially recover from cross-claiming defendant). Rather, the relief HGIC sought against United Postal was merely recissionary; there are no allegations that United Postal was an active participant in any scheme to

---

[5]HGIC's claims for damages against Stewart were for indemnification of any amounts for which HGIC might be liable under the mortgage insurance policies. According to United Postal's counterclaim against HGIC, the insurance policies covered at most 207 of the principal and interest due. Thus, even if United Postal recovered the requested 207 from HGIC under the policies, it would still potentially have a claim against Stewart for its remaining losses.

defraud. This distinction is important because it has been carried over from the common law rule, and the federal courts still employ it. The courts are usually willing to allow a defendant to relate back a cross-claim in the nature of recoupment, indemnity, or contribution which seeks to reduce the amount a plaintiff can recover from that defendant; conversely, however, if the defendant's cross-claim "is an affirmative or independent cause of action not in the nature of a defensive claim, the defendant must comply with the applicable statute of limitations." *Brothers Builders,* 702 F.Supp. at 1569; *see also Appelbaum v. Ceres Land Co.,* 546 F.Supp. 17, 20 (D.Minn.1981), *aff'd,* 687 F.2d 261 (8th Cir.1982).

Acknowledging this distinction, United Postal contends that its cross-claim is a defensive, rather than affirmative, claim because it is "defensively postured"—similar to a claim for contribution—since "if someone is required to pay for a loss incurred in connection with the Prestonwood Green condominiums, it should be Stewart...." This argument does not hold water because HGIC did not sue—and indeed could not have sued—United Postal for money damages. Consequently, United Postal had no right to seek offset damages from Stewart. Simply put, United Postal can only recover from Stewart based upon affirmative claims and must independently satisfy the relevant statutes of limitations without the benefit of relation back.

The district court characterized United Postal's argument as requesting that Rule 15(c) be used to "ratify all pleadings which

12

would otherwise be time barred, as long as the party who seeks to invoke the rule has an operative pleading on file."  The district court properly declined to accept the invitation to adopt such an expansive interpretation of Rule 15(c),[6] and we agree with its conclusion that Rule 15(c) does not apply under the facts presented because United Postal did not have an operative pleading on file with the court below to which the October 23, 1990, cross-claim could relate back.

### 3. The applicable statutes of limitation

United Postal asserted cross-claims against Stewart for negligence, negligent misrepresentation, fraud, breach of fiduciary duty, and breach of contract.  As this is a diversity case, and the causes of action all arise under state law, the district court properly applied the applicable Texas statutes of limitations to the claims presented.  *See Fluor Eng'g & Constr. v. Southern Pac. Transp. Co.,* 753 F.2d 444, 448 (5th Cir.1985).

The district court applied a four-year statute of limitations

---

[6]Rule 15(c) cannot be read to mean that any untimely cross-claim or pleading automatically relates back to the original complaint or answer merely because the later pleading arises from the same conduct, transactions and occurrences; otherwise, all cross-claims would be exempted from any time limitations because such claims must arise out of the same conduct, transactions, and occurrences in order to be asserted as cross-claims.  *See* FED.R.CIV.P. 13(g).  Rather, there must be indication that the opposing party has been put on notice.  6A CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1496 (1990) ("[T]he standard for determining whether amendments qualify under Rule 15(c) is not simply an identity of transaction test; although not expressly mentioned in the rule, the courts also inquire into whether the opposing party has been put on notice regarding the claim or defense raised in the amended pleading.").

to United Postal's claims for negligent misrepresentation, fraud, and breach of fiduciary duty. We agree with the court below that Texas fraud claims prescribe if not brought within four years from accrual. *See Williams v. Khalaf,* 802 S.W.2d 651, 656-58 (Tex.1990); Tex.Civ.Prac. & Rem.Code Ann. § 16.004 (Vernon 1986). However, as will be discussed further below in section II.B.1.a., and as the lower court recognized in its subsequent order granting summary judgment on HGIC's negligent misrepresentation claims, the two-year limitations period for general torts is the correct measure for this type cause of action. *See* Tex.Civ.Prac. & Rem.Code Ann. § 16.003 (Vernon 1986). Moreover, as will be detailed in section II.B.1.b., the limitations period for the fiduciary duty claims is also two years.[7] *Id.* Finally, a breach of contract claim is governed by a four-year limitation period. Tex.Civ.Prac. & Rem.Code Ann. § 16.004(a)(3) (Vernon 1986).

### 4. Point of accrual

The determinative issue on appeal is whether the court below measured the statutes from the appropriate reference point—i.e., whether it chose the correct point of accrual. United Postal's fraud, negligent misrepresentation, and fiduciary duty claims were based upon Stewart's alleged failure to disclose the substitution of the second liens for cash down payments. The second liens were filed in March of 1984, and the district court charged United

---

[7]However, the district court's error in giving United Postal the benefit of the longer limitations period for the negligent misrepresentation and fiduciary duty claims obviously did not affect the ultimate conclusion that the claims were barred.

14

Postal with constructive knowledge of the existence of these liens at the time they were filed of record. Thus, it concluded, the statutes of limitations ran by March of 1988, and United Postal's cross-claim filed in 1990 was simply too late. Similarly, the court below held that the contract claim—based upon Stewart's purported failure to follow Congressional's closing instructions—accrued no later than March 15, 1985, when the second lien notes were filed in the Dallas County deed records.

The court below correctly cited the relevant Texas authority holding that a cause of action for fraud is generally considered to accrue either when the fraud is discovered or when the facts giving rise to the fraud claim are discovered or might reasonably be discovered through reasonable diligence—the so-called "discovery rule." *See Mooney v. Harlin,* 622 S.W.2d 83, 85 (Tex.1981); *Lightfoot v. Weissgarber,* 763 S.W.2d 624, 626 (Tex.App.—San Antonio 1989, writ denied). We disagree, however, with the district court that the recording date of the second liens started the limitations period. The court below principally relied upon the Texas Supreme Court's opinion in *Mooney,* which it interpreted as charging United Postal, the mortgage owner, with constructive knowledge of the public records concerning its property. United Postal contends that the opinion below improperly interprets *Mooney* to provide that a recording in the deed records constitutes a wholesale constructive notice of the contents to anyone having an interest relating to the property. *Mooney* involved the claims of a former girlfriend and care-giver against the estate of her lover. She did

15

not file her lawsuit for fraud against the estate until over four years after the will had been admitted to probate. *Mooney,* 622 S.W.2d at 84. The Texas Supreme Court held that her claims were too late because "[e]xamination of the probate records would have disclosed that the will" made no bequest to the plaintiff. *Id.* at 85. In this context, the Texas court stated that "[a] person is charged with constructive knowledge of the actual knowledge that could have been acquired by examining public records." *Id.* Important to the holding, however, was the fact that Texas law charges all persons interested in an estate with knowledge of the contents of the probate records. *Id.* (citing *Salas v. Mundy,* 59 Tex.Civ.App. 407, 125 S.W. 633, 636 (Amarillo 1910, writ ref'd)). Therefore, the recording of a document in public records serves as constructive notice for limitations purposes only for those persons who are under an obligation to search the records. *Lightfoot,* 763 S.W.2d at 627; *Cox v. Clay,* 237 S.W.2d 798, 804 (Tex.Civ.App.—Amarillo 1950, writ ref'd n.r.e.) ("[I]t is settled by numerous decisions of our courts that [a duly recorded instrument] carries notice of its contents only to those who are bound to search for it....").

Once United Postal acquired its interest as assignee of Congressional, it was not required to make continuous searches of the real property records for interests subsequently secured. *Biswell v. Gladney,* 213 S.W. 256, 258 (Tex.Comm'n App.1919) (A mortgagee is not charged with constructive notice of a subsequently recorded deed conveying part of the land involved.); *see also Cox*

16

*v. Clay,* 237 S.W.2d at 804 ("[T]he object of all registration acts is to affect with notice only such persons as have reason to apprehend some transfer or incumbrance prior to their own, because none arising afterwards can affect them or their estate in the land."); *Boucher v. Wallis,* 236 S.W.2d 519, 526 (Tex.Civ.App.—Eastland 1951, writ ref'd n.r.e.) (observing that the "purpose of [the Texas] recording laws is to notify *subsequent* purchasers ... and not to give protection to the alleged perpetrators of fraud.") (emphasis added); *cf. Westland Oil Dev. Corp. v. Gulf Oil Corp.,* 637 S.W.2d 903, 908 (Tex.1982) (noting that recordation gives constructive notice of facts disclosed by the documents within a chain of title to a purchaser). Thus, the recordation of the second liens after United Postal had already acquired its interests as mortgagee was not sufficient to put United Postal on notice of its potential claims against Stewart and commence the limitations period. *Cox v. Clay,* 237 S.W.2d at 803-04.

Thus concluding that the date of recordation is not the relevant focus for our accrual analysis, we must determine what facts were sufficient to put United Postal on notice of any malfeasance and when those facts were, or should have been, discovered. Doubtlessly, when United Postal learned of the existence of the second liens or of the failure to provide cash down payments at closing, its fraud and breach of fiduciary duty claims would have accrued. We agree with Stewart that United Postal's receipt of HGIC's complaint after it was filed on January

17

22, 1986, was sufficient to start the clock. In that pleading, HGIC set forth ample allegations of wrongdoing on Stewart's behalf and put United Postal on notice of the asserted actions and omissions which form the basis of the October 1990 cross-claim.

United Postal concedes that it received the complaint and that its cross-claim contained "virtually the same factual allegations against Stewart as [HGIC] had alleged against Stewart [in its 1986 complaint]," but argues that it did not have sufficient proof to make such allegations against Stewart until the Baker deposition in May of 1990. Without the evidence from the Baker deposition, United Postal contends that it would have risked violating Federal Rule of Civil Procedure 11 by filing a claim based upon unsubstantiated assertions. What United Postal fails to appreciate, however, is the fact that Rule 11 has absolutely nothing to do with the discovery rule. The cause of action was deferred only until United Postal acquired knowledge of the facts giving rise to its claim, not until it had sufficient facts to *prove* the allegations. Therefore, we conclude that United Postal was put on notice of sufficient facts as would alert it to its potential fraud claims against Stewart in January of 1986, when it received a copy of the complaint in the case at bar, and its delay in filing a claim for over four years after that date resulted in the claim being barred.[8]

---

[8]United Postal alternatively argued in its reply brief that the statute was tolled during a fifteen month stay of the proceedings in the instant litigation—presumably due to Congressional's bankruptcy. As we have noted before on countless occasions, this court does not "consider arguments belatedly

As will be discussed in greater detail in section II.B.1.a *infra,* we hold that the discovery rule is not applicable to negligent misrepresentation claims under Texas law and apply the general rules of accrual for negligence causes of action.[9]  Because a cause of action sounding in negligence accrues at the time of the act or omission alleged to constitute negligence, *Fusco v. Johns-Manville Products Corp.,* 643 F.2d 1181, 1183 (5th Cir. Unit A 1981), and the events giving rise to potential liability took place in late 1983, the statute ran out long before United Postal filed its cross-claim in 1990.  Accordingly, the district court correctly granted summary judgment on these claims.

B. Summary Judgment On HGIC's Claims Against Stewart

As noted above, the district court granted summary judgment in favor of Stewart, holding that (i) HGIC's negligent misrepresentation and fiduciary duty claims were barred by limitations, and (ii) there was no evidence of fraud.  We review the decision to grant summary judgment *de novo,* applying the same

---

raised after appellees have filed their brief" in the absence of manifest injustice.  *Najarro v. First Fed. Sav. & Loan Ass'n,* 918 F.2d 513, 516 (5th Cir.1990);  *see also Smith v. Lucas,* 9 F.3d 359, 367 n. 16 (5th Cir.1993).  United Postal does not offer reason for its delay in interposing this issue, and we do not find any "manifest injustice" in refusing to consider it.

[9]The court below again treated fraudulent and negligent misrepresentation claims alike in deciding upon an accrual point in its March 14 Dismissal.  Subsequently, in the June 4 Order, the court properly reversed its position and refused to apply the discovery rule to the negligent misrepresentation claims, as will be discussed below.  The erroneous application of the discovery rule, however, actually gave United Postal the benefit of prolonging the limitations period, and the claims were still found to have prescribed.

criteria employed by the district court in the first instance. *Federal Deposit Ins. Corp. v. Dawson,* 4 F.3d 1303, 1306 (5th Cir.1993). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once a properly supported motion for summary judgment is presented, the burden shifts to the non-moving party who bears the burden of proof at trial to show with "significant probative" evidence that there exists a triable issue of fact. *In re Municipal Bond Reporting Antitrust Litig.,* 672 F.2d 436, 440 (5th Cir.1982).

1. Stewart's limitations defenses

a. negligent misrepresentation

This court has previously interpreted the Texas authorities to apply a two-year statute of limitations to negligent misrepresentation claims. *See Sioux Ltd. Sec. Litig. v. Coopers & Lybrand,* 914 F.2d 61, 63-64 (5th Cir.1990). HGIC contends, however, that *Sioux* is inconsistent with the Texas Supreme Court's holding in *Williams,* 802 S.W.2d at 656-58, and urges us to adopt the four-year statute, citing *M & M Distrib. v. Dunn,* 819 S.W.2d 639, 640 (Tex.App.—Corpus Christi 1991, no writ) (equating "misrepresentation" with fraud claims and applying the four-year statute of limitations). This court has already evaluated the

20

effect of *Williams* upon Texas negligent misrepresentation claims and determined that "*Williams* addresses the limitations period only for fraud claims.  It has no application to a claim of negligent misrepresentation."  *Sioux,* 914 F.2d at 64;  *see also Milestone Properties, Inc. v. Federated Metals Corp.,* 867 S.W.2d 113, 119 (Tex.App.—Austin 1993, no writ) (holding that, because negligent misrepresentation does not require intent, it sounds in negligence rather than in fraud, and is thus subject to the two-year negligence statute of limitations);  *Texas Am. Corp. v. Woodbridge Joint Venture,* 809 S.W.2d 299, 302 (Tex.App.—Fort Worth 1991, writ denied) (also applying the two-year statute).   We expressly determined that the two-year statute covered negligent misrepresentation claims and may not now deviate from the *Sioux* holding unless the Texas courts issue supervening decisions.  *See Broussard v. Southern Pac. Transp. Co.,* 665 F.2d 1387, 1389 (5th Cir.1982) (en banc) (holding that one panel of this court may not overrule another panel's determinations of the law of a state in a diversity case).

Alternatively, HGIC argues that the adoption of a two-year statute would not bar its negligent misrepresentation claims because of the application of the discovery rule.  In support of its position, HGIC points us to a number of Texas cases in which it contends the discovery rule was applied to similar claims.[10]

---

[10]*See, e.g., Lightfoot v. Weissgarber,* 763 S.W.2d 624, 626 (Tex.App.—San Antonio 1989, writ denied);  *Cook Consultants, Inc. v. Larson,* 677 S.W.2d 718, 721 (Tex.App.—Dallas 1984), *rev'd on other grounds,* 690 S.W.2d 567 (Tex.1985);  *Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.,* 381 S.W.2d 937, 939

Further, in HGIC's view, the Texas Supreme Court's decision in *Gaddis v. Smith,* 417 S.W.2d 577, 580-581 (Tex.1967), is especially instructive. That case involved a medical malpractice claim that the operating physician had left a foreign object in the patient's body. The Texas court applied the discovery rule due to the unusual circumstances presented, which HGIC advocates are analogous to the one at bar in that the negligence was not readily discernible. *Id.* at 580.

The district court found that the discovery rule generally plays no role in a negligence action, such as negligent misrepresentation, under the relevant Texas authorities. In support of its conclusion, it made reference to this court's observation in *Sioux* that a negligent misrepresentation claim sounds in negligence rather than fraud and determined that the point of accrual was "the commission of the negligent act, not the date of the ascertainment of damages." *See Fusco,* 643 F.2d at 1183 (citations omitted). The court further distinguished all of the cases relied upon by HGIC except *Gaddis* as involving *fraudulent* misrepresentation claims and opined that *Gaddis* was a "peculiar type" of case and therefore "an exception to the general rule expressed in *Fusco.*" Thus concluding that the limitations period should date back to the time of the alleged misrepresentations in December of 1983, the court found HGIC's claims to be barred.

---

(Tex.Civ.App.—Waco 1964), *reformed on other grounds,* 392 S.W.2d 352 (Tex.1965); *see also Sioux Ltd. Sec. Litig. v. Coopers & Lybrand,* 901 F.2d 51, 53 (5th Cir.), *superseded by,* 914 F.2d 61 (5th Cir.1990).

22

We similarly decline to apply the discovery rule to a negligent misrepresentation claim, finding that the Texas courts classify such a cause of action as a negligent tort rather than a fraud action. *See Milestone Properties,* 867 S.W.2d at 119 ("[B]ecause negligent misrepresentation does not require knowledge, it "is properly identified as being a claim sounding in negligence rather than fraud'....") (quoting *Woodbridge,* 809 S.W.2d at 303); *see also Great American Mortgage Investors v. Louisville Title Ins. Co.,* 597 S.W.2d 425, 430 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.) (demonstrating that the tort of negligent misrepresentation is grounded in principles of negligence). Thus, such a claim should be subject to the rules of accrual governing negligence, and we will apply the general Texas rule that the limitations period for negligence actions runs from "the commission of the negligent act, not the date of the ascertainment of damages." *Fusco,* 643 F.2d at 1183. The cases cited by HGIC do not persuade us otherwise. In *Lightfoot,* the court of appeals discussed the application of the discovery rule in a pure fraud context; there were no claims for negligent misrepresentation. 763 S.W.2d at 624. After careful review of *Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.,* 381 S.W.2d 937, 939 (Tex.Civ.App.—Waco 1964), *reformed on other grounds,* 392 S.W.2d 352 (Tex.1965), we are unable to conclude that the court specifically applied the discovery rule to negligent misrepresentation claims; rather, it appears that the court was also discussing fraud and fraudulent misrepresentation causes of action in that case. The case is ambiguous on the point, and we

23

are not confident in relying upon it for authority that the discovery rule applies to negligent misrepresentation actions.

Contrary to HGIC's assertions, the Dallas court of appeals in *Cook Consultants, Inc. v. Larson,* 677 S.W.2d 718, 721 (Tex.App.—Dallas 1984), *aff'd in part, rev'd in part on other grounds,* 690 S.W.2d 567 (Tex.1985), did not hold that the discovery rule applied in this context. Instead, that court specifically ruled that it "need not determine whether the discovery rule applies in the instant case because, even if it does, the evidence indicates that Larson actually discovered the [alleged misrepresentation] more than two years prior to the institution of suit." *Id.*[11] Similarly, in *Coleman v. Rotana, Inc.,* 778 S.W.2d 867, 873 (Tex.App.—Dallas 1989, writ denied), the court did not expressly hold that the discovery rule applied, but rather stated in dictum that the latest the claim could have accrued—i.e., when the appellants had knowledge of the misrepresentation—was still beyond the limitations period. Finally, *Sioux Ltd. Sec. Litig. v. Coopers & Lybrand,* 901 F.2d 51, 53 (5th Cir.), *superseded by,* 914 F.2d 61 (5th Cir.1990) involved both fraudulent misrepresentation claims—to which the discovery rule unquestionably applies—and negligent misrepresentation allegations. The authorities upon which we relied to set forth the parameters of the discovery rule

---

[11]Moreover, the court in *Larson* recognized the general rule that a negligence action accrues at the time of the negligent act or omission, "despite the difficulty of ascertaining damages until a later date." *Cook Consultants, Inc. v. Larson,* 677 S.W.2d 718, 721 (Tex.App.—Dallas 1984), *aff'd in part, rev'd in part on other grounds,* 690 S.W.2d 567 (Tex.1985) (citing *Bauman v. Centex Corp.,* 611 F.2d 1115, 1118 (5th Cir.1980)).

were pure fraud cases. However, even giving the plaintiffs the benefit of the discovery rule on the negligent misrepresentation claim, we held the claims to have been barred. *Id.*

Given the lack of clear authority to the contrary and the persuasiveness of the Texas cases refusing to apply the discovery rule in this context, the district court did not err in holding that the negligent misrepresentation claims accrued in December of 1983, when it is undisputed that the misrepresentations, if any, were made. HGIC failed to file its suit until January of 1986. We therefore affirm the judgment of the district court dismissing HGIC's negligent misrepresentation claims as being barred by limitations.

### b. fiduciary duty

The limitations period for a breach of fiduciary duty claim appears to be similarly unsettled in the Texas courts. *Compare Spangler v. Jones,* 797 S.W.2d 125, 132 (Tex.App.—Dallas 1990, writ denied) (applying section 16.051 of the Civil Practice and Remedies Code, the four-year residual limitations provision, to fiduciary claims) *with Hoover v. Gregory,* 835 S.W.2d 668, 676 (Tex.App.—Dallas 1992, writ denied) (holding that the two-year limitations period for torts applies to a fiduciary claim) and *Russell v. Campbell,* 725 S.W.2d 739, 744 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (applying the two-year statute of limitations under section 16.003 of the Texas Civil Practice and Remedies Code to fiduciary duty causes of action). Unfortunately, both the two-year and four-year limitations periods have been

employed by our court, resulting in an internal conflict. *Compare Resolution Trust Corp. v. Seale,* 13 F.3d 850, 852 (5th Cir.1994) (holding that a breach of a fiduciary duty of care is a tort claim subject to the two-year general tort limitations statute) *and FDIC v. Dawson,* 4 F.3d 1303, 1307 (5th Cir.1993) (same) *with McGill v. Goff,* 17 F.3d 729, 734 (5th Cir.1994) (relying upon *Spangler,* 797 S.W.2d at 132, and utilizing four-year rule) *and Sheet Metal Workers Loc. Union No. 54 AFL-CIO v. E.F. Etie Sheet Metals Co.,* 1 F.3d 1464, 1469 (also citing *Spangler* and concluding that *Williams* instructs the Texas courts to apply a four-year statute of limitations to fiduciary claims). The general rule in our court is that we look to the earlier line of authority where two lines of panel decisions conflict. *Texaco, Inc. v. Louisiana Land and Exploration Co.,* 995 F.2d 43, 44 (5th Cir.1993). However, as noted above, this court also employs a rule in diversity cases that overrules our prior precedent when there is a significant change in the applicable state's substantive law. *Broussard,* 665 F.2d at 1389 ("[A] prior panel decision should be followed by other panels without regard to any alleged existing confusion in state law, absent a subsequent state court decision or statutory amendment which makes this Court's [prior] decision clearly wrong.") (quoting *Lee v. Frozen Food Express, Inc.,* 592 F.2d 271, 272 (5th Cir.1979)). Thus, rather than trace the two lines of authority to their roots to determine which was earlier, we look to the Texas state courts' recent pronouncements on the issue to resolve the question. We find the Texas Supreme Court's 1990 decision in

26

*Williams* to be the definitive point to which we must first turn in evaluating this issue. Unquestionably, *Williams* was a supervening decision which clarified the statute of limitations for fraud in Texas and discussed its impact upon other tort claims. HGIC claims that *Williams* dictates the application of the four-year residual statute to fiduciary duty claims. It points to *Spangler* as authority for this proposition. In *Spangler,* the Dallas court likened a breach of fiduciary duty claim to a cause of action for fraud or deceit for which it claimed there is no express limitations period and concluded that section 16.051 of the Texas Civil Practices and Remedies Code, the residual statute of limitations period, should apply. 797 S.W.2d at 132 ("Inasmuch as there is no limitations statute expressly applying to "fraud,' "deceit,' "misrepresentation,' or any similar term, we conclude that [§ 16.051], providing for all actions for which there is "no express limitations period,' the statute of limitations is [sic] four years is applicable.") (citing *Williams,* 802 S.W.2d at 654). We do not find the reasoning in *Spangler* to be persuasive. First, despite the fact that the Texas Supreme Court recited in *Williams* that "[t]here is no limitations statute expressly applying to "fraud,' ...," it held that the limitations period governing an action on a debt—section 16.004(a)(3) of the Texas Civil Practices and Remedies Code—was applicable. Moreover, in *Williams,* Texas' highest court expressly stated that:

> We do not retreat from our analysis in [*First Nat'l Bank v. Levine,* 721 S.W.2d 287 (Tex.1986) ]. In general, torts developed from the common law action for "trespass,' and a **tort not expressly covered by a limitation provision nor**

27

> ***expressly held by this court to be governed by a different provision would presumptively be a "trespass' for limitations purposes. The same common law development simply does not apply to fraud as to most other torts.***

802 S.W.2d at 654-55 (emphasis added). Breach of fiduciary duty is clearly a "tort" under Texas law, and thus, would appear to fall within this reasoning. Moreover, the Texas Supreme Court declined to overrule prior decisions setting forth a two-year statute of limitations for certain similar tort claims, such as legal malpractice[12] and breach of the duty of good faith and fair dealing,[13] which had been raised as analogies for employing the two-year limitations statute for fraud. *Williams,* 802 S.W.2d at 654 n. 2. For these reasons, we do not find persuasive the reasoning in *Spangler* that *Williams* dictates the application of the four-year statute of limitations for fiduciary duty claims and decline to follow the opinions of this court which rely upon *Spangler.*

Further, the first case by this court to confront the issue after *Williams* applied the two-year general tort statute of repose set forth in section 16.003 to a Texas fiduciary duty claim. *See Russell v. Board of Trustees of the Firemen, Policemen and Fire Alarm Operators' Pension Fund,* 968 F.2d 489, 492-93 (5th Cir.1992),

---

[12]*See Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988) (holding that "legal malpractice is in the nature of a tort and is thus governed by the two-year limitations statute").

[13]*Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 168 (Tex.1987) (applying two-year statute to breach of good faith and fair dealings claims); *see also Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 827 (Tex.1990) (affirming use of two-year statute to good faith and fair dealing claims, although modifying accrual analysis of *Arnold* ).

28

*cert. denied,* --- U.S. ----, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993). Although *Russell* did not address the *Williams* decision, it definitively determined the applicable limitations period, and its result further persuades us to apply the two-year period absent a sea change in Texas law. Therefore, we adopt the line of cases applying the two-year tort statute of limitations to such causes of action—*see, e.g., Russell,* 968 F.2d at 492-93 and *Dawson,* 4 F.3d at 1307—and affirm the judgment of the district court granting summary judgment on HGIC's fiduciary duty claims.[14]

## 2. HGIC's fraud claims

The parties agree that the Texas statute of limitations for fraud is four years, *see Williams,* 802 S.W.2d at 656-58, and that HGIC filed its lawsuit well within that period. Stewart contends however, that HGIC has not and cannot meet its *Celotex* burden with respect to several of the elements of its fraud cause of action.

Under Texas law, HGIC must prove that (i) Stewart made a false representation as to a past or existing fact (ii) which was material to the transaction, (iii) Stewart knew the representation to be false, (iv) and made the representation for the purpose of inducing HGIC to take certain action, (v) HGIC reasonably relied

---

[14]Although HGIC asserts in its brief that the fiduciary duty claims should be subject to the discovery rule, it failed to brief this point on appeal. Thus, any error it could assert with respect to the district court's failure to apply the discovery rule to these claims has been waived. *See, e.g., Burlington Northern R.R. Co. v. Office of Inspector Gen., R.R. Retirement Board,* 983 F.2d 631, 638-39 n. 3 (5th Cir.1993); *Atwood v. Union Carbide Corp.,* 847 F.2d 278, 280 (5th Cir.1988) ("[I]ssues not briefed, or set forth in the list of issues presented, are waived."), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989).

upon the representation, (vi) to its detriment. *Meyers v. Moody*, 693 F.2d 1196, 1214 (5th Cir.1982), *cert. denied*, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991).

The district court evaluated the summary judgment evidence and decided that there was no evidence that Stewart had actual knowledge of any false assertions it may have made in the settlement statements. Further, the court determined that HGIC had failed to introduce evidence to satisfy another of the critical elements of fraud—that Stewart's representations were made with an intent to deceive HGIC or to induce HGIC to act in a particular manner. The court below concluded that:

> The evidence introduced by HGIC would probably raise issues of fact regarding negligence. However, there is no evidence that Stewart ... engaged in fraudulent activity with respect to the transactions at issue.

Accordingly, it dismissed HGIC's fraud claims against Stewart. We agree with the district court's assessment of the summary judgment evidence on this point. The representations which HGIC claims were fraudulent were (i) the HUD-1 settlement statements reflecting earnest money deposits which failed to disclose that they were paid outside the closing, (ii) Baker's purported failure to disclose the existence of the second liens to Congressional,[15] (iii) the FNMA affidavits, notarized by Baker, which reflect that there was no

---

[15] *See Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 272 (5th Cir.1989) (noting that a misrepresentation need not be a direct assertion).

secondary lien financing on the properties, and (iv) the loan applications which reflect that the downpayments were held in escrow by Stewart.

The only document alleged to be fraudulent that was prepared by Stewart was the HUD-1 form, which, as discussed previously, failed to recite specifically that the earnest money deposits were made outside closing. Although there is no specific notation that the earnest money was paid outside closing as would be consistent with the instructions on the HUD-1, the earnest money deposit was shown as a reduction in the total amount due from the borrower pursuant to the settlement statement, as well as a reduction in the total amount owed to the seller at closing, indicating that the earnest money had already been transferred from buyer to seller outside the closing. We agree with the district court that there may be issues of fact regarding negligence in the preparation of this document, but, without more, the evidence is insufficient to create a jury issue of fraud. Baker testified that she relied upon Congressional's closing instructions, undisputedly reflecting that the FNMA affidavits—which had been prepared by Congressional and had already been signed by the borrowers and seller—were enclosed for her notarization. The uncontroverted evidence reveals that Stewart was not instructed to confirm that the earnest money deposits had previously been given to the developer and that Baker in fact relied upon the sworn statements of the purchasers and seller that the earnest money had been delivered. Further, Stewart was not instructed to review the loan applications, but instead to

31

present the sealed envelopes to the buyers—who were to sign and reseal them—and simply to send the sealed documents back to Congressional.

Moreover, Baker's purportedly inconsistent notarization of the second liens and the FNMA affidavits reflecting that no secondary financing had been obtained does not charge her with knowledge of the contents of either of those sets of documents. Rather, notarization is a certification by the notary *only* that the persons whose signatures appear on the affidavits swore before a notary that the statements contained in the documents were true. *See Shelton v. Swift Motors, Inc.,* 674 S.W.2d 337, 342 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). The FNMA affidavits were prepared by Congressional, the mortgage company, and signed prior to closing. As noted above, Stewart was not instructed to verify the accuracy of the affidavits, but rather to notarize them and include them with the closing documents.

With respect to the second liens, Baker testified consistently that she had no knowledge of their contents, and neither HGIC nor United Postal showed otherwise. The only controverting evidence offered by HGIC was expert testimony that Baker would have had to have read—or at least noticed—the contents of the documents and understood their implications upon several of the numerous transactions she was in the process of closing. We are unwilling to place such an elevated standard of imputed knowledge upon escrow agents. The second liens were presented to Baker for simple notarization under circumstances wholly outside the closings

32

involved. The persons requesting Baker's notarization were also participants in other transactions which Baker did not close. Although one of the second liens contains a Stewart filing identification number on it, Baker denied having written the number on the document, and HGIC offered only speculation that "no one else would have had reason to do this," to controvert her testimony. In light of the undoubtedly countless documents notarized and filed by Baker as a title agent, we cannot presume—absent additional circumstances as would give rise to an inference of fraud—that her notarization of the second liens or FNMA affidavits is "significant probative evidence" that there exists a triable issue of fact as to either Stewart's knowledge or intent to deceive. *In re Municipal Bond Reporting,* 672 F.2d at 440.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.