**IT CORPORATION, Plaintiff,**

v.

**MOTCO SITE TRUST FUND, et al., Defendants.**

**Civ. A. No. H–91–3532.**

United States District Court, S.D. Texas, Houston Division.

Dec. 13, 1994.

1108

J.C. Nickens, Houston, TX, mediator.

Daniel J. Davis, Gardere & Wynne, Dallas, TX, Stephen Lofton, Andrews & Kurth, Houston, TX, for plaintiff.

Mark C. Watler, Woodard, Hall & Primm, Houston, TX, Lawrence E. Goldenthal, Woodard Hall & Primm, Houston, TX, for defendants.

Michael L. Rice, Jones Day Reavis & Pogue, Dallas, TX, for respondent.

### MEMORANDUM AND ORDER

ROSENTHAL, District Judge.

Monsanto Company ("Monsanto") and the Mercantile Bank of St. Louis, N.A., Trustee of the Motco Site Trust Fund ("Trustee") (collectively "defendants"), have filed a Rule 50(b) Motion for Judgment as to 1990 Release, (Docket Entry No. 395), and a Motion for Judgment *Non Obstante Veredicto* or, Alternatively, for New Trial, (Docket Entry No. 396). Plaintiff IT Corporation ("ITC") has filed a Motion for Entry of Judgment, (Docket Entry No. 404).

For the reasons stated below, defendants' Rule 50(b) motion is GRANTED and the motion for judgment *non obstante veredicto*

or for new trial is DENIED in part and GRANTED in part. The motion for entry of judgment is GRANTED in part and DENIED in part.

## I. Factual Background

On October 20, 1987, the United States District Court, Galveston Division, entered a Partial Consent Decree settling claims filed by the United States Environmental Protection Agency ("EPA") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The Consent Decree was executed by parties potentially responsible for the presence of hazardous wastes at a former chemical waste disposal site known as the "Motco Site." The Consent Decree required the settling defendants, including Monsanto, to finance and perform certain remedial action at the Motco Site. The Motco Site Trust Fund was created for the remediation work. The Trustee of the Fund was to hold and manage the money contributed by the settling defendants and to hire the contractor to clean up the Motco Site.

During the four years before the Consent Decree, both Monsanto and the EPA had investigated the wastes at the Motco Site and analyzed remediation alternatives. The EPA had hired two independent consulting firms, $CH_2M$ Hill and Black & Veatch; Monsanto had hired Woodward Clyde Consultants. These firms studied the Motco Site and provided reports. Based on these studies, Monsanto recommended, and the EPA ordered, on-site incineration of the contaminated materials at the Motco Site.

In October 1986, Monsanto prepared a Request for Proposal ("RFP") for the Motco Site remediation work and sent it to contractors for comments. In the RFP, Monsanto provided a written "Scope of Work" that described the Motco Site and the waste materials in the eight pits to be remediated. The Scope of Work included technical data about the volume and properties of the waste materials in the pits. The data included the amounts of waste water, "high BTU liquid organics," "low BTU liquid organics," and "sludges/tars/solids" present at the Site. These waste profiles were based upon Monsanto's analysis of the data provided by the consultants. Monsanto summarized the waste characteristics and volumes in the RFP, and disclosed the underlying studies.

The RFP specified on-site incineration as the primary remediation method and required a lump sum bid for the remediation work. ITC reviewed the RFP and submitted comments. In response to those comments, Monsanto revised the RFP and sent it back to ITC.

In September 1987, ITC submitted its bid for a lump sum of $28,330,854, plus unit price extensions of $4,553,146, for a total bid of $32,884,000. Before submitting its bid, ITC had visited the Motco Site, obtained some waste samples, and performed tests on certain oils from two of the pits. ITC submitted the bid with a signed statement that it had visited the Site and was familiar with current Site conditions. On January 4, 1988, ITC and defendants signed the Remediation Contract, and ITC began work.

ITC encountered delays during the early phases of its work. In May 1990, the parties began negotiating ITC's claims to that point. On September 26, 1990, the parties executed a Release and Settlement Agreement providing that ITC would receive additional payment for the project delays and changes to the Scope of Work, in exchange for a release of certain claims. Under the 1990 Settlement Agreement, defendants paid, and ITC accepted, $3.1 million to settle $8.9 million in claims for additional work that ITC had asserted at that time.

On December 4, 1990, ITC informed defendants in writing that the information Monsanto had provided in the 1987 RFP and related bid documents about the waste characteristics and amounts "may be" wrong. ITC stated that while incinerating liquids in one of the pits at the Site, ITC had discovered that the actual quantity of oil in the pit was one-third of the amount specified in the RFP. (P.Ex. 36). ITC continued to work under the contract while providing defendants with progressively more detailed information as to the amounts, classifications, and BTU content of the different types of con-

taminants that were in fact in the Motco Site pits.

ITC's bid and work were based on the use of incinerators using Hybrid Thermal Treatment Systems, known as "HTTS" units. These incinerators depended on the use of liquid injection incineration, which in turn depended on the amount of liquid wastes as opposed to sludges/tars/solids, and the BTU values of those wastes. (TR. 156:20—160:24). ITC asserted that the amount of liquids actually present at the Site was much lower than the RFP had described; that the amount of solids was much higher; and that the BTU values of the sludges/tars were much greater. ITC alleged that it could not reasonably have discovered the errors until it had done extensive work at the Site. ITC asserted that these differences had a "drastic" impact on the efficiency of ITC's intended method of incineration and the price. If it had known the true amounts, mix, and characteristics of the waste at the Motco Site, ITC claimed that it would have designed, sized, and configured its equipment differently, and would have provided a different contract price.

ITC claimed that because the waste was not as represented, ITC could not do the work with the equipment provided and for the price set. Because the mix of wastes at the site was substantially different from the mix of wastes upon which it had bid, ITC claimed additional compensation for remediating the "new" wastes. ITC also contended that during the contract period, defendants had interfered with ITC's performance by dumping over one million gallons of contaminated water into pit 7. ITC sought an "equitable adjustment" to the contract price.

Defendants refused to accept ITC's findings or consider an adjustment until ITC had completed the "trial burn" using the HTTS incineration units. ITC continued to work under the contract while the parties negotiated the request for equitable adjustment.

The parties were not able to reach agreement. In late November 1991, ITC notified Monsanto that it intended to suspend performance under the contract, which it did on December 1, 1991. This lawsuit and counterclaim resulted.

In its pleadings, ITC alleged that it was forced to discontinue operations at the Motco Site because defendants had misrepresented the Site conditions and had interfered with ITC's remediation work. ITC asserted causes of action based on breach of contract, breach of implied warranty, negligent and fraudulent misrepresentation, and gross negligence. ITC sought $55.8 million in actual damages, punitive damages, and attorneys' fees.

Defendants responded that ITC was required by the terms of the contract to remediate the Site, regardless of the amount or type of waste encountered. Defendants argued that ITC had inspected the Site before submitting the bid and represented itself as capable of performing the remediation work. Defendants claimed that no information was included in the RFP that was known to be inaccurate and that no material information was withheld.

Defendants also challenged ITC's claims that the RFP waste inventory description was inaccurate. Defendants claimed that ITC's waste inventory data was wrong and that ITC's work at the Site from 1987–1990 had drastically changed the Site from the way it had been at the time the RFP was prepared. Defendants asserted that the problems ITC had experienced were the result of poor management and/or equipment. Defendants denied that they had pumped contaminated water into pit 7 so as to interfere with ITC's work.

Defendants also contended that the 1990 Settlement Agreement between ITC and the Motco Trust released $8.1 million for ITC's claims asserted as of September 1990.

Defendants filed counterclaims based on fraud and breach of contract, and sought $20.9 million in damages for completing the project, as well as attorneys' fees.

This case was tried before a jury from March 18, 1994 until April 20, 1994. On April 20, 1994, the jury returned a verdict in favor of ITC. The jury's responses to the questions relevant to the pending motions are set forth below.

## Question 1

Did Motco Trust or Monsanto make a positive assertion of BTUs, viscosities or quantities of waste in the RFP that was materially false, upon which ITC justifiably relied in connection with its 1988 contract with Motco Trust?

Answer: <u>Yes</u>

## Question 2

Before the execution of the 1988 contract, did IT Corporation make an investigation of the accuracy of the BTUs, viscosities or quantities of waste described in the RFP?

Answer: <u>No</u>

## Question 3

Did Monsanto or Motco Trust commit fraud?

Answer: <u>Yes</u>

## Question 4

Did Monsanto or Motco Trust commit negligent misrepresentation?

Answer: <u>Yes</u>

These questions were limited by the jury instructions to the period before the 1988 Remediation Contract was signed.

## Question 7

Did Monsanto or Motco Trust breach its contract with IT Corporation?

Answer: <u>Yes</u>

The instructions accompanying this question limited it to the allegation that defendants had interfered with ITC's performance by pumping contaminated water into pit 7.

## Question 11

Is IT Corporation "estopped" to complain of any of the following:

a. Monsanto or Motco Trust's breaches of the contract.

Answer: <u>No</u>

b. Monsanto or Motco Trust's fraud

Answer: <u>No</u>

c. Monsanto or Motco Trust's negligent misrepresentation

Answer: <u>No</u>

## Question 12

When IT Corporation executed the August 7, 1990 Supplemental Agreement and Settlement and Release Agreement was it aware of the material misrepresentations as to the BTUs, viscosities or quantities of waste in the RFP?

Answer: No

## Question 13

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate IT Corporation for its damages, if any, that resulted from Monsanto or Motco Trust's breach of contract?

Consider the following elements of damages, if any, and none other:

The reasonable value of the labor and materials IT Corporation put into the project in accordance with the contract, whether the result has any value to Monsanto or Motco Trust or not, less amounts paid to IT Corporation under the contract.

Answer $ 52,823,356.53

## Question 14

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate IT Corporation for its damages, if any, that were proximately caused by Monsanto or Motco Trust's fraud?

Consider the following elements of damages, if any, and none other.

a. The difference between the value of what IT Corporation parted with and what it received.

b. Other damages that were a natural, probable and foreseeable consequence of Monsanto's and Motco Trust's fraud.

Answer $ 52,823,356.53

## Question 15

What sum of money, if any, if paid now in cash, should be assessed against Monsanto and awarded to IT Corporation as punitive damages, if any, for the conduct found in response to Question 3?

Answer $ 28,550,000.00

## Question 16

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate IT Corporation for its damages, if any, that were proximately caused by Monsanto's negligent misrepresentation?

Consider the following elements of damages, if any, and none other.

a. The difference, if any, between the value of what IT Corporation parted with and what it received.

b. The pecuniary loss, if any, otherwise suffered as a consequence of IT Corporation's reliance on the misrepresentation.

The damages recoverable for a negligent misrepresentation do not include the benefit of IT Corporation's contract with Motco Trust.

Answer: $ __52,823,356.53__

Question 17

What is a reasonable fee for the necessary services of IT Corporation's attorneys in this case, stated in dollars and cents?

a. For preparation and trial.

Answer $ __2,302,748.41__

b. For an appeal to the Court of Appeals.

Answer $ __250,000.00__

---

## II. The Pending Motions

### A. The Parties' Positions

ITC asks this court to enter judgment in its favor for the full actual and punitive damages awarded.

Defendants ask this court to find the following:

(1) Any misrepresentation as to Site conditions in the RFP was not a breach of the 1988 Remediation Contract, so that the jury's answers to Questions 1 and 2 were immaterial.

(2) There was insufficient evidence to support the jury's findings of misrepresentation, fraud, or negligent misrepresentation, so that the jury's answers to Questions 1, 2, 3, and 4 were not supported by sufficient evidence.

(3) The jury's answer to Question 4 was immaterial as a matter of law because the statute of limitations barred a negligent misrepresentation claim.

(4) The 1990 Settlement Agreement is enforceable as a matter of law, making the jury's response to Question 12 immaterial,

and there was insufficient evidence to support the jury's response to Question 12.

(5) The imposition of punitive damages was unwarranted by Texas law and by the evidence, so that the jury's answer to Question 15 should be set aside.

(6) The damages submission in Questions 13 and 14 was improper under Texas law.

### B. Summary of the Court's Rulings

This court finds that there was sufficient evidence to support ITC's claims that the information on the RFP waste amounts and characteristics was wrong and that this had a material impact on ITC's ability to do the contract work. There was sufficient evidence for the jury's answer to Question 1 that defendants had made a "positive assertion of BTUs, viscosities or quantities of waste in the RFP that was materially false, upon which ITC justifiably relied in connection with its 1988 contract with Motco Trust." The court also finds that there was sufficient evidence to support the jury's answer to Questions 2 and 3, that, before the execution of the 1988 Remediation Contract, ITC did not investigate the accuracy of the BTU values, viscosities, or quantities of waste de-

scribed in the RFP, and was not estopped from asserting breach of contract. The court does determine that, under Texas contract law, the answers to these questions were material.

This court does not find sufficient evidence or legal basis to support the jury's finding of fraud (Question 3) or the imposition of punitive damages (Question 15). The court also finds that the statute of limitations precludes ITC's cause of action for negligent misrepresentation (Question 4).

This court finds that there is sufficient evidence to support the jury's response to Question 12, that when ITC executed the Settlement and Release Agreement, it was unaware of the misrepresentations contained in the RFP. However, the court finds that as a matter of law, the 1990 Settlement Agreement is enforceable, and that the jury's response is therefore immaterial.

The court finds that the actual damages finding was supported by sufficient evidence and by the applicable law, except as noted below.

### III. Standard of Review

■■■■■ This court reviews a motion for judgment *NOV* under the standard set out in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc). *See also Roberts v. United New Mexico Bank at Roswell*, 14 F.3d 1076, 1078 (5th Cir.1994); *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 266 (5th Cir.1994). This court must review all of the evidence "in the light and with all reasonable inferences most favorable to the party opposing the directed verdict or judgment notwithstanding the verdict." *Fruge v. Penrod Drilling Co.*, 918 F.2d 1163, 1165 (5th Cir.1990) (quoting *Boeing*, 411 F.2d at 374). This standard of review is exacting. As the Fifth Circuit has recently affirmed:

> The verdict must be upheld unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable [persons] could not arrive at any verdict to the contrary. If there is evidence of such quality and weight that reasonable and fair minded [persons] in the exercise of impartial judgment might

reach different conclusions, the jury function must not be invaded.

*Roberts*, 14 F.3d at 1078 (quoting *Western Co. of North Am. v. United States*, 699 F.2d 264, 276 (5th Cir.), *cert. den'd*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983)).

### IV. Waiver of Objections to the Jury Verdict

■■■■ ITC first claims that defendants have waived objections to the sufficiency of the evidence supporting the jury's verdict. This court finds that defendants have preserved their right to object to the sufficiency of the evidence.

On April 7, 1994, defendants filed a Motion for Partial Summary Judgment with this court that asserted grounds for relief as a matter of law. That motion raised the same arguments defendants now assert to challenge the verdict. (Docket Entry No. 352). Defendants filed this motion at the conclusion of ITC's case-in-chief, (TR. 2550–66); reurged the motion at the end of defendants' case-in-chief; and urged the motion again following the close of all the evidence. (TR. 3972–73, 4225, 4227–28). Defendants have not waived their right to object to sufficiency of the evidence or to seek a JNOV.

### V. Breach of Contract: Assumption of Risk As to the Site Conditions

Defendants argue that as a matter of law: (1) the Remediation Contract placed the risk of the Site conditions on ITC; (2) ITC assumed the risk by verifying in the contract that ITC had visited the Motco Site and was familiar with the Site conditions; and (3) ITC is estopped by its investigation from complaining about any misrepresentations in the RFP. Defendants claim that the jury's answers to Questions 1, 2, and 11 are immaterial and should be disregarded.

■■■■ Defendants' primary argument is that, as a matter of Texas law, the Remediation Contract placed the risk of differing or unexpected Site conditions on the contractor. Defendants emphasize that the contract was for a lump sum, did not require the contractor to perform according to specifications set by the owner, and required the contractor to inspect the Site before bid. Even if the RFP

did contain incorrect Site information, defendants assert, ITC bore that risk as a matter of Texas law.

ITC does not dispute that it was to formulate the plan to remediate the Motco Site for a lump sum. However, ITC asserts that the contract did not require ITC to bear the risk that the RFP misrepresented the nature and amounts of the wastes to be incinerated.

▮▮▮ Neither party contends that the contract is ambiguous. This court must interpret the contract in accordance with Texas law. In construing a contract, a court must determine the objective intent of the parties as expressed in the contract language. *U.S. For Use of Straus Sys. v. Associated Indem.,* 969 F.2d 83, 85 (5th Cir.1992); *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). The meaning of an unambiguous contract is a question of law for the court. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). If plans, specifications, or technical data are by express terms made a part of the contract, they are to be construed as part of the entire agreement. *See Guerini Stone Co. v. P.J. Carlin Const. Co.,* 240 U.S. 264, 276, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916); *Hill & Combs v. First Nat. Bank of San Angelo,* 139 F.2d 740, 742 (5th Cir.1944). The Remediation Contract expressly provided that it included the Scope of Work. (Defendants' Ex. 162).

### A. The RFP, the Bid Process, and the Remediation Contract

On October 1, 1986, Monsanto forwarded the RFP to ITC. (ITC Exhibit No. 4). The transmittal letter stated that the waste characteristics data was included in the RFP "for information only and will not establish the basis for qualifying bids, quantities, methods, compositions, etc. We feel that sufficient information is available to allow a responsible, experienced contractor to provide a lump sum bid for the service required. If your company has a problem with the approach, please reply with your specific concerns and proposed remedies." (*Id.*)

The proposed bid format included the following language:

3. Organic Wastes and Soils Removal

The information as shown in Section IV of this bid package shall be used in determination of the lump sum price. This data is based upon test results by an independent consultant and is considered reliable. Contractor shall base his price on this information with a suitable contingency based upon contractor's experience. No future cost claims or adjustments will be allowed for waste quantities different from the quantities shown in this bid package except those resulting from a change in depth of soil removal below the pit bottom.... If additional soil removal is required, the difference in soil volume will be paid on the basis of an independent survey of the final pit elevations and the calculated quantity based on additional in-situ yards of soil removed.

.... 

4. Incineration

.... 

The information as shown in Section IV of this bid package shall be used in determination of the lump sum price. This data is based upon test results by an independent consultant and is considered reliable. Contractor shall base his price on this information with a suitable contingency based upon contractor's experience. No future cost claims or adjustment will be allowed for BTU content of the wastes or waste quantities different from the quantities shown in this bid package except for those resulting from a change in depth of soil removal below the pit bottom sludge/soil interface or in the tank farm and perimeter areas.

(*Id.*)

On October 9, 1986, ITC responded to the bid format required by the RFP. In the response, ITC objected to bearing the risk of variances in the waste characteristics. (ITC Exhibit 5). ITC's response stated as follows:

Items

| | |
|---|---|
| E 1 a) | Monsanto states that no price |
| E 3 | adjustment will be made for quantities |
| E 4 | different than those noted in the bid package and requests the bidder to make allowances for variances. |

*Comment*

We recommend that the bid format contain "Fixed Unit Rates" for differences in quantities (plus or minus). The variances should be measured by weight of material which is to be remediated. A calibrated scale with automatic recording can be used to measure solids. Tank displacements or flow meters and analytical data can be used to measure liquids and sludges.

A structure that will fairly allocate contract risks (the Site condition risks to Monsanto and the Site remediation risks to the contractor) will minimize contractual conflicts, create an environment of construcive [sic] cooperation and in our judgment provide the conditions for the lowest "contract close out cost" to Monsanto. The lowest "contract close out cost" can, in our opinion, be achieved by avoiding having contractors make unnecessary allocations within their bid for inquantifiable variances in site conditions, and by formulating a contract structure that will not encourage the contractor to "seek" change orders and claims or reduce his standard of performance should his daily costs be negatively impacted by unpredicted site conditions.

In response to ITC's objections, and following a meeting held in January 1987, defendants sent ITC a revised RFP. The revised RFP, and executed contract, *deleted* the language stating that no future cost claims would be allowed for waste quantities or BTU contents that were different from the quantities shown in the bid package. (ITC Exhibit 2). The revised bid format, and executed contract, provided for "unit prices" for actual amounts of additional materials excavated or incinerated beyond a specified elevation on the drawings provided. *Id.* However, ITC's proposal that the entire bid format be revised from a lump sum to a fixed unit price format was rejected by defendants.

Defendants' letter transmitting the 1987 RFP stated that the Scope of Work in the RFP included sufficient information for a bid proposal. (Docket Entry No. 407, Ex. 11; TR. 151; ITC Exhibit 1). There was no statement in the letter telling ITC that the data provided was for a limited purpose and could not be used as a basis for preparing a bid. The Scope of Work in the revised RFP included the tables prepared by Monsanto providing data as to the wastes at the Motco Site. These tables contained waste profile data that broke the pit wastes down into specified numbers of gallons of High BTU Liquid Organics, Low BTU Liquid Organics, Pit Waste Water, and Sludges/Tars/Solids. (ITC Exhibit 2). Defendants also made the underlying studies available to ITC.

The revised RFP bid format also contained the following language relating to the conditions at the Motco Site:

> *All bidders must verify that they have accepted the terms and conditions of the contract, requirements, schedules, and penalties of the attached Consent Decree,* including attachments, *as part of their responsibilities and costs,* and as an integral part of this bid request.

> *All bidders must verify they have visited the Site and are familiar with current site conditions.* All bidders must verify that they were given the opportunity to examine samples of MOTCO waste materials available at the Monsanto Research Center in St. Louis, Missouri.

The revised RFP also stated as follows:

> D. *Operations*
>
> 1. *Surface Debris*
>
> . . . .
>
> Note: *No cost adjustments* will be allowed for surface debris quantities different from those noted in Section V of this bid package. Contractor to investigate site prior to bid submittal and include in his bid a contingency allowance based upon visual observation.

(ITC Exhibit 2) (emphasis in original). There was no language in the revised RFP precluding future cost adjustments for *subsurface* conditions or quantities.

The revised RFP was part of ITC's bid package, submitted to defendants on September 28, 1987. On November 10, 1987, defendants held a public meeting at which all the bids were opened. Defendants accepted ITC's bid by signing the Remediation Contract on January 4, 1988. The bid and RFP,

including the Site data, were part of the Remediation Contract. (Defendants' Ex. 162).

The Remediation Contract stated that the "[t]rustee has made or will make available to contractor information concerning the existing Jobsite which it has available and is pertinent to the Remedial Action." (Defendants' Ex. No. 162, Art. 2.4). The information included the reports prepared by Black & Veatch Consulting Engineers in 1981 and 1982 and by CH₂M Hill in 1984; remedial investigations performed for Monsanto by Woodward Clyde Consultants in 1984 and 1985; and the EPA Record of Decision.

The Remediation Contract defined the "Scope of Work" as follows:

2.1 The "Work" to be performed by Contractor under this Agreement shall consist of furnishing all personnel, supervision, services, field labor, materials, tools, equipment, supplies and all things required for the necessary design, engineering, construction of facilities and all associated services to properly complete the Remedial Action in strict accordance with the Project Scope of Work set forth and defined in Exhibit "A" hereto and in a manner such that the Remedial Action will be given final approval and acceptance by the EPA.

Exhibit A of the Remediation Contract, entitled "Scope of Work," stated:

Contractor shall provide all labor, material, equipment and supervision required to complete the remediation of the Motco Site from award of contract through design, construction, operations, closure and final approval of completed closure of the United States Environmental Protection Agency.

The Scope of Work includes only the area within the fenced boundaries of the Motco Site.... Scope of Work also does not include treatment or recovery of groundwater, except that which backflows into the pits, and contaminated rain water. Information on groundwater and offsite contamination noted in the bid package is for reference only.

The Scope of Work section in the RFP and Remediation Contract included extensive tables and maps describing the geologic and hydrologic characteristics of the site. It also included tables listing quantities of organic pit wastes, waste water, and estimated amounts of ash that could be returned to the Site. The tables describing the waste segregated the pit quantities by BTU content and by whether the wastes could be pumped or not. (Defendants' Ex. 162, Attachment B).

The contract defined the "Remedial Action" in Exhibit B, as follows:

*General*

The remedial action agreed to with the EPA, consists of:

- On site incineration of all combustible oils, tars, sludges, emulsions and crusts as well as incineration of designated quantities of contaminate soil.
- Disposal of contaminated pit and rain waters, construction dewatering, and any seepage waters by on-site pre-treatment followed by pumping to Gulf Coast Waste Disposal Authority or by on-site incineration.
- Disposal of scrubber water and equipment decontamination water by on-site pre-treatment followed by pumping to Gulf Coast Waste Disposal Authority or by on-site incineration.
- Backfill of pits with clay and delisted incinerator ash.
- Disposal of surface debris and buried metals by incineration, off-site disposal in secure landfill or decontamination followed by on-site pit disposal or off-site sanitary landfill disposal.
- Final grading, capping, placing of top soil, seeding and fencing of the area.

. . . .

- The remedial actions for this project exclude any treatment of groundwater within, or wastes or soils in areas outside of the existing fence line of the MOTCO property.

The contract included a "Changes Clause," Article 6.0, which provided that if the Trustee ordered changes to the work, and the changes affected the capability of the Jobsite disposal facilities to meet the contractor's

performance guarantees, the contractor would not be required to perform the work unless the guarantees were modified. The Changes Clause also provided for adjustments to the lump sum amount for any changes to the work, either by agreed lump sum, by contractually specified unit prices, or by a formula for determining costs incurred in performing the changes.

## B. Where the Contract Placed the Risk

Defendants cite *Lonergan v. San Antonio Loan & Trust Co.*, 101 Tex. 63, 104 S.W. 1061 (Tex.1907), and *Emerald Forest Utility Dist. v. Simonsen Construction Co.*, 679 S.W.2d 51 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e), for the proposition that a fixed price contract, in which the contractor is afforded an opportunity to inspect the site before bidding, as a matter of law places on the contractor the risk that the owner's plans or specifications are inaccurate or inadequate to perform the work. Defendants also rely on *Lonergan* and *City of Dallas v. Shortall*, 131 Tex. 368, 114 S.W.2d 536 (Tex.Comm. App.1938), for the proposition that Texas law rejects an implied warranty that pre-bid specifications provided by an owner are accurate.

In *Lonergan*, a contractor had agreed to construct a building according to plans and specifications prepared by the owner's architect. The owner was a trust company. The contractor abandoned the job after the nearly completed structure collapsed due to problems with the plans. The court held that under the facts before it, the owner's act of passing on specifications for the project did not in itself guarantee that the specifications were suitable for the proposed construction. The court stated as follows:

> If there be any obligation resting upon the [owner] as guarantor of the sufficiency of the specifications, it must be found expressed in the language of the contract, or there must be found in that contract such language as will justify the court in concluding that the parties intended that the owner should guarantee the sufficiency of the specifications to [the contractor].

*Id.*, 104 S.W. at 1066. In *Lonergan*, the court found no express contractual warranty

that the plans were sufficient for the construction, and no other language in the contract to indicate that the parties intended such a result.

Similarly, in *Emerald Forest*, the contractor had agreed to construct an underground sewer system according to plans furnished by the owner. The sewer line failed soon after completion. The court examined the contract language and held that the owner had not promised, expressly or by implication, that the plans provided were sufficient for the work. 679 S.W.2d at 53. The court therefore held that the contractor was liable for breach of its promise to deliver a working sewer system.

In *Emerald Forest*, the court recognized that *Lonergan* and *Emerald Forest* were distinguishable from cases in which the contract placed the responsibility on the owner to provide sufficient or accurate specifications for the work. 679 S.W.2d at 53. In later cases, courts have noted that the *Lonergan* holding, followed in *Emerald Forest*, is based on the premise that if the contractor is in as good a position as the owner to know whether the plans or specifications are sufficient for the intended purpose, the contractor should bear the risk that the lump sum contract will not cover unexpected or extra costs. *City of Houston v. L.J. Fuller, Inc.*, 311 S.W.2d 285 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Turner, Collie & Braden v. Brookhollow, Inc.*, 624 S.W.2d 203, 207–208 (Tex.App.—Houston [1st Dist.] 1981), *aff'd in part and rev'd in part on other grounds*, 642 S.W.2d 160 (Tex.1982).

In cases in which the contractor is *not* in as good a position as the owner to evaluate the information provided, and the contract language provides a basis for concluding that the parties objectively intended the owner to bear the risk that the information provided is inadequate or inaccurate, Texas courts have not followed *Lonergan* and *Emerald Forest*. *See, e.g., Newell v. Mosley*, 469 S.W.2d 481 (Tex.App.—Tyler 1971, writ ref'd n.r.e.); *Bd. of Regents v. S & G Construction Co.*, 529 S.W.2d 90 (Tex.App.—Austin 1975, writ ref'd n.r.e.); *Turner Collie v. Brookhollow*, 624 S.W.2d 203 (Tex.1982).

Unlike the owners in *Lonergan* and *Emerald Forest*, the defendants in this case provided the contractor with pre-bid data as to the waste quantities and qualities, which became part of the Remediation Contract. Unlike the language in the *Lonergan* and *Emerald Forest* contracts, the terms of the bid package and Remediation Contract in this case did *not* tell the contractor that the Site data provided was merely an "estimate" to be used only for information, that the contractor could not use to determine whether it was sufficient to prepare a bid. Defendants forwarded the final RFP to ITC with the express representation that "[s]ufficient information for the proposal is included in the attached SCOPE OF WORK." (TR. 151; Docket Entry No. 407, Attachment 11; Exhibit 86). Unlike the owners in *Lonergan* and *Emerald Forest*, Monsanto told ITC that the Site data was sufficient for a bid, and did not limit ITC's reliance on the data.

The executed Remediation Contract precluded cost adjustments for Site conditions different from those described in the RFP only as to *surface* debris removed in the "Operations" phase. There is no language in the executed Remediation Contract precluding cost adjustments for different *subsurface* conditions or quantities encountered in the "Wastes and Soil Removal" and "Incineration" phases of the Remediation Contract. ITC's complaints relate to waste characteristics and amounts that were *not* readily apparent surface debris, but rather subsurface conditions and quantities encountered in the Waste and Soil Removal and Incineration work.

The Remediation Contract language is different in critical respects from language found in cases holding that the parties' contract evidenced an intent to place the risks of variance on the contractor. *See, e.g., Green Const. Co. v. Kansas Power & Light Co.,* 717 F.Supp. 738, 743 (D.Kan.1989), *reconsideration granted on other grounds,* 732 F.Supp. 1550 (1990) (the contract stated that "the determination of character of subsurface materials which will be encountered shall be each bidder's responsibility," and that the test boring provided by the owner "may not be indicative of all subsurface conditions that may be encountered"); *Anderson v. Golden,* 569 F.Supp. 122, 142–43 (S.D.Ga.1982) (the contract specifically provided that the contractor was responsible for determining subsurface conditions and that the owner did not guarantee the accuracy of the soil conditions data provided); *McDevitt & Street Co. v. Marriott Corp.,* 713 F.Supp. 906, 914 (E.D.Va.1989), *rev'd and remanded on other grounds,* 911 F.2d 723 (4th Cir.1989) (the contract explicitly placed the risk of unanticipated soil conditions on the contractor by the owner's disclaimer that the soils report provided was solely for "convenience" and was not an assumption of "any responsibility for the data as being representative of the conditions and materials which may be encountered"; the contract did not include the soil report; and the contract expressly barred claims based on soil conditions different from those described in the report).

By contrast, Monsanto expressly assured ITC that "[s]ufficient information for the proposal is included in the attached SCOPE OF WORK," and did not qualify ITC's use of the data (Docket Entry No. 407, Exhibit 11, p. 2). Defendants expressly barred claims based on different conditions only for readily apparent surface debris in the "Operations" phase, *not* for subsurface conditions and quantities encountered in the "Wastes and Soil Removal" and "Incineration" phases. There is no language precluding claims for such subsurface variances. The Remediation Contract language evidences no intent to make ITC responsible for the risks of subsurface variances.

Courts that have refused to hold an owner liable for inaccurate pre-bid information also rely on specific "no changes" clauses. *See, e.g., I.O.I. Systems, Inc. v. City of Cleveland,* 615 S.W.2d 786 (Tex.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). In *I.O.I. Systems,* the Notice to Bidders stated:

> The Submission of a bid by a bidder shall be conclusive evidence the bidder is fully acquainted and satisfied as to the character, quality and quantity of work to be performed and materials to be furnished.

The Special Conditions of the contract stated:

the degree of accuracy of this [topographical] information shall in no way relieve the CONTRACTOR or others of any responsibility for the proper performance of the work, or obligations of the Contract Documents.

The contract also stated that soil boring data was available from the engineer, but that the "report was obtained by and for the engineer only and is not intended to be anything other than a guide." Finally, the contract stated:

unless otherwise specified, all loss or damage to the CONTRACTOR arising out of the nature of the work to be done, or from the action of the elements, or from any unforeseen circumstances in the prosecution of the same or difficulties which may be encountered in the prosecution of the work, shall be sustained and borne by the CONTRACTOR at his own cost and expense.

*I.O.I.*, 615 S.W.2d at 789. *See also, Shortall*, 114 S.W.2d at 538 (the contract contained a clause admonishing contractors to familiarize themselves with the site conditions and inquire about discrepancies because "no claims on any such grounds will be entertained, or changes allowed in the specifications or plans after contract is awarded except under conditions named in the contract as 'Extra,' 'Omitted,' or 'Changed Work' ").

The Remediation Contract between ITC and Motco contained no such "no changes" clause. *Compare Shintech Inc. v. Group Constructors, Inc.*, 688 S.W.2d 144, 151 (Tex. App.—Houston [14th Dist.] 1985, no writ) ("*Where the contract is silent on the subject,* there is an implied warranty that the plans and specifications for a construction job are accurate and sufficient for the purpose in view" (emphasis added)).

This court finds that the parties' objective intent, as expressed in the Remediation Contract, was that defendants would assume the risk that the quantities and characteristics of the subsurface waste in the Motco Site pits differed from the data set out in the RFP.

### C. ITC Was Not in as Good a Position as Defendants to Assess the Sufficiency of the Bid Information

ITC presented evidence that it was not in as good a position as the defendants to evaluate the waste quantities and characteristics at the Motco Site. Murray Hutchinson, ITC's executive officer, testified as follows:

Q: What I'd like you to do for a moment is to describe to the jury all of the reasons, based upon standard commercial practices, that IT did not set forth to spend the money, the resources, the time required, to do a full and complete site investigation and feasibility study for the purpose—for the purpose of determining whether what Monsanto told them was true. Can you do that?

A: Over a period of probably five years, there had been three contractors that—on working for Monsanto and one working for the EPA—and two working for the EPA who had done a site investigation and indicated what was there. Then, as represented in the proposal, Monsanto had brought all of that information together in their scope of work.

We were familiar with that process and we do a lot of those investigations ourselves for the EPA and for the private sector. Contractors rely on that information to prepare their bids. It's— Normally, if you design a house and you give the contractor a set of specifications and he build it to your specifications, you can't say, "Well, that was just a picture. We really wanted it bigger."

Q: I guess what I want to ask you is whether, based on your 20 or so years of experience in the service business and, in particular, in the environmental services business, is it customary and standard practice to rely upon a scope of work provided by a client for doing lump-sum best-price proposal?

A: Absolutely.

Q: Is there any other way to do it?

A: There is none.

(TR. 2328–29).

William Rickman, an independent incineration consultant, testified as follows:

Q: Have you ever prepared a lump-sum proposal for an incineration project?

A: Yes, I have.

Q: Have you ever prepared one where you weren't given the specifications as to the type and the amount of materials?

A: No, I don't know how you could really do it otherwise.

Q: Do you know of anyone in your industry that's ever done that?

A: No.

(TR. 824).

Rudy Novak also testified that ITC could not, and did not, perform a full and complete investigation to verify the accuracy of the RFP waste characteristics data. (TR. 165–167).

The facts in this case do not present a situation similar to those involved in *Emerald Forest* or *Lonergan.* The contractor here did not have the same opportunity or ability as the owner to gather information about the Motco Site and to judge the sufficiency of that information before submitting its bid.

**D. ITC's Obligation to Visit the Site Did Not Require it to Assume the Risk of Subsurface Variances**

Defendants argue that the following provision in the RFP placed the risk of inaccurate information in the RFP on ITC:

All bidders must verify that they have visited the Site and are familiar with current site conditions. All bidders must verify that they were given the opportunity to examine samples of Motco waste materials available at the Monsanto Research Center in St. Louis, Missouri

(Defendant's Ex. No. 85, ¶ I)

However, this provision must be read in context with the following provision, which was also a required part of the bid format:

*No Cost Adjustments* will be allowed for surface debris quantities different from those noted in Section V of this bid package. Contractor to investigate site prior to bid submittal and include in his bid a contingency allowance based upon visual observation.

(Defendant's Ex. No. 85, ¶ I.D.1)

The Remediation Contract required ITC to visit the Site and to make a visual observation of the Site conditions. There is no indication that ITC was required as a result of these observations to undertake a full sampling and analytical program to determine whether the contents of the pits shown in the Scope of Work of the Contract and RFP was accurate. The specific data provided in the Scope of Work included the quantities of liquids, sludges, and solids to be found in the eight pits. This data could not be derived from a Site investigation and visual observation.

The contract language in this case is clearly distinguishable from that in *Emerald Forest,* in which the "Instructions to Bidders" required that the bidders "visit the Site of the work, and fully inform themselves as to all conditions and the matter which can in any affect the work or cost thereof." 679 S.W.2d at 53. *See also Merrill–Ruckgaber Co. v. U.S.,* 241 U.S. 387, 393, 36 S.Ct. 662, 665, 60 L.Ed. 1058 (1916) (no recovery for work where the specifications required bidders "to visit the site and fully inform themselves of the character of the same ... and failure to do so ... would not relieve the successful bidder from the necessity of furnishing material or performing any labor that might be required to complete the work in accordance with the true intent and meaning of the specifications and drawings ...").

Defendants argue that an ITC internal memorandum dated July 22, 1987 establishes that ITC knew that it had assumed the risk of inaccurate information in the RFP. This memorandum, authored by ITC employee R.E. Frulla, states in relevant part as follows:

The MOTCO proposal is the most difficult proposal we have had to prepare to date. The difficulty stems from the fact that it is up to us to determine the most cost effective mode of operation and basically assume all the risks. As you know, the contract will be awarded to the *lowest cost proposal which is responsive to the RFP requirements.*

The implications of the procurement method are that:

1. The contractor must take all the risks of performance and find a profit margin by adopting a very cost effective operation, and

2. The contractor proposal becomes the basis of potential change order negotiations when requirements are imposed onto the contractor beyond those requirements contained in the consent decree and the EPA/State regulations.

(Defendants' Ex. 117) (emphasis in original).

The Frulla memorandum does not establish that ITC assumed the risk that the RFP data was false. The emphasized language in the Frulla memorandum points out that ITC's bid must be cost-effective and responsive to the job described in the RFP. The memorandum discusses the risk presented by a lump-sum contract as opposed to a cost-plus contract. The memorandum does not support the conclusion that ITC bore the risk that the RFP information as to Site conditions, that ITC used to bid the job, was false.

At trial, ITC offered testimony that it visited the Site, observed the Site conditions, and took limited samples, but that the parties intended ITC to rely upon the detailed information in the Scope of Work as to the BTUs, viscosities, and quantities of materials. This testimony included the following:

(1) ITC's verification of the Site conditions related only to those conditions which were visually observable. ITC relied upon the RFP data to the contents of the pits which could not be observed in a site visit. (TR. 2329 & 2331).

(2) ITC's observation of samples provided by Motco and Monsanto had no bearing upon the specific data provided in the RFP regarding BTUs, viscosities, and quantities. (TR. 2332—2333).

(3) It is industry custom to rely upon the data provided by an owner such as Motco Trust and Monsanto. (TR. 2328:11—2329:24).

Rudy Novak, the principal design engineer responsible for preparation of the bid design, testified as follows:

(1) ITC did not undertake to perform a full and complete investigation to verify the accuracy of the RFP waste characteristics. (TR. 165:17–23).

(2) No prudent contractor would have undertaken to perform a remediation investigation under the circumstances of the issuance of the RFP. (TR. 167:9—168:8).

(3) ITC relied upon the waste characteristics in the RFP based upon the language that "sufficient information for the proposal was included in the attached scope of work." (TR. 151:15—151:25).

Novak also testified that there was insufficient time between the issuance of the RFP and the deadline to submit a proposal to carry out an investigation into the accuracy of the RFP data. (TR. 166:24—167:9). The uncontroverted evidence at trial was that the RFP data included sounding measurements of the waste pits and analyses of the waste samples that took place over a period of years. The RFP was issued in May 1986, and the proposal was originally due in the middle of August 1986. Monsanto did not controvert Novak's testimony that a sampling study, analysis, and incineration proposal could not be done in the time between receiving the RFP and submitting a bid.

### E. Texas Law Does Not Preclude ITC's Claim For Breach of Contract Based on Inaccurate Data in the RFP

Monsanto cites *City of Dallas v. Shortall*, 131 Tex. 368, 114 S.W.2d 536 (Tex.Comm. App.1938), for the following proposition:

It is practically a universal rule that "where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered."

*Id.* at 540 (citation omitted).

In *City of Dallas v. Shortall*, the court held that the contractor could not recover damages from the property owner because of the owner's pre-bid statement as to the site conditions. The court summarized the cases

in which a party to a construction contract seeks to recover damages for unexpected site conditions based on the owner's representations about the site. The court held that the plaintiff must show that the representation:

> was made as an affirmative statement of fact, or as a positive assertion, and made under such circumstances, or with such accompanying assurances, as justified plaintiff in relying thereon, without investigating on his part; and that he in fact made no independent investigation on his part to ascertain the truth.

114 S.W.2d at 542.

In *Shortall*, the court examined the contract before it and found that the pre-bid documents required the contractor to examine the specifications and plans and apply to the engineer if more information was required. The contract specifically stated that "no claims" would be allowed on the ground that the specifications or plans were not sufficient. *Id.* at 538. As noted above, the Remediation Contract here contains no claim preclusion language for subsurface conditions.

When Monsanto first sent ITC the RFP, the proposed bid format did include language that "[n]o future cost claims or adjustment will be allowed" for waste quantities or BTU content "different from the quantities shown in this bid package." (ITC Exhibit 4, Attachment K). ITC objected to this language, recommending that the lowest price could only be achieved by avoiding placing the risk of unquantifiable variances upon the contractor. In the final RFP, Monsanto deleted the language placing the risk of variances in subsurface BTUs and waste quantities on the contractor.[1]

In *Shortall*, as in *Emerald Forest* and *Lonergan*, the court found that the contractor had been in as good a position to conduct an investigation of the site as the owner before submitting a bid. *Id.* at 543. The record before this court supports the opposite result.

Finally, in *Shortall*, the court found that the owner had not in fact made the representation that the contractor contended was false. The jury in the present case did find misrepresentations in the RFP as to the waste amounts and characteristics, and the record is sufficient to support that conclusion.

This case is more similar to the facts described in *Hollerbach v. United States*, 233 U.S. 165, 172, 34 S.Ct. 553, 556, 58 L.Ed. 898 (1914), in which the Supreme Court stated as follows:

> [T]he specifications assured [the contractor] of the character of the material,—a matter concerning which the [owner] might be presumed to speak with knowledge and authority. We think this positive statement of the specifications must be taken as true and binding upon the [owner] and that upon it, rather than upon the claimants, must fall the loss resulting from such mistaken representations. We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which the specifications furnished by the [owner] as a basis of the contract left in no doubt. If the [owner] wished to leave the matter open to the independent investigation of the claimants, it might easily have omitted the specification as to the character of the [site]. . . . In its positive assertion of the nature of this much of the work, it made a representation upon which the claimants had a right to rely without an investigation to prove its falsity.

*Id.* (quoted in *Shortall*, 114 S.W.2d at 541–42).

Texas courts have held owners responsible for positive assertions of fact which are inaccurate and which cause the contractor damages, based on both breach of contract and misrepresentation. In *Shintech Inc. v. Group Constructors, Inc.*, 688 S.W.2d 144 (Tex.App.—Houston [14th District] 1985, no writ), the court refused to give effect to a site

---

1. The fact that the language explicitly placing on ITC the risk of differing BTU values and waste quantities was deleted from the RFP may be considered as indicative of the "circumstances ... justif[ying] plaintiff in relying [upon representations made about the site conditions]." *Shortall*, 114 S.W.2d at 542.

inspection clause to deny the contractor recovery for delays and hindrances resulting from inaccuracies in the owner-furnished information. The court stated as follows:

> More specifically, we reject [the owner's] contention that [the contractor] assumed the risk of defective specifications. We find no evidence that the [the contractor] had knowledge of defective specifications prior to beginning its work. Where the contract is silent on the subject, there is an implied warranty that the plans and specifications for a construction job are accurate and sufficient for the purpose in view.

*Id.* at 151. *See also, Board of Regents v. S and G Construction Company,* 529 S.W.2d 90 (Tex.App.—Austin 1975, writ ref'd n.r.e.) (the contractor was awarded damages for the owner's failure to provide correct site plans, which required the contractor to change its work); *North Harris County Junior College District v. Fleetwood Construction Company,* 604 S.W.2d 247 (Tex.App.—Houston [14th District] 1980, writ ref'd n.r.e.) (damages were awarded to the contractor for an incorrect soil foundation report furnished by owner); *City of Baytown v. Bayshore Constructors, Inc.,* 615 S.W.2d 792, 793 (Tex. App.—Houston [1st District] 1980, writ ref'd n.r.e.) ("[t]he failure of an owner to provide correct or adequate plans and specifications as are necessary to carry out the work required by a contract constitutes a breach of the contract...."); *Newell v. Mosley,* 469 S.W.2d 481 (Tex.App.—Tyler 1971, writ ref'd n.r.e.) (where the owner asserted that the plans were sufficient and accurate, the contractor has a right to rely on the representation); *Turner, Collie and Braden, Inc. v. Brookhollow, Inc.,* 624 S.W.2d 203 (Tex. App.—Houston [1st District] 1981, *reversed on other grounds,* 642 S.W.2d 160 (Tex.1982). In *Turner,* the court stated:

> our courts have recognized that a cause of action exists in favor of a contractor against an owner or architect who furnishes defective plans and specifications.

624 S.W.2d at 208.

One court has explained the implied warranty and misrepresentation holdings in fixed-price contract cases as follows:

> To overcome the rule that extra compensation is not recoverable when unforeseen difficulties are encountered during the course of performing a fixed-sum contract which is capable of performance, courts have found that an implied warranty by the owner that conditions are as described in plans and specifications may be breached by defective plans.... The warranty is not vitiated by standard clauses disclaiming responsibility for the accuracy of data or requiring the contractor to verify the specifications by inspecting the site. This is so because contractors cannot be expected to perform certain investigations such as soil borings. In order to calculate a bid, bidders must be able to rely on representations by the owner as to subsoil conditions and other nonobvious conditions....
>
> ....
>
> Thus, placing the risk of uncertainty on the contractor does not absolve the owner of the duty not to materially misrepresent conditions.

*Anderson v. Golden,* 569 F.Supp. 122, 142–43 (S.D.Ga.1982) (citations omitted). Texas cases recognize the same reasons for holding an owner responsible for damages resulting from inaccurate prebid site information. *See, e.g., Newell v. Mosley,* 469 S.W.2d at 483 (a contractor who was not an architect or surveyor had no duty to make an independent investigation of the site to ensure that a house could be built as shown on the plans).

Based on an analysis of the contract documents, this court concludes that the parties intended ITC to rely upon the Site information provided in the RFP. Defendants expressly informed ITC that the Site data was sufficient for bid preparation. Defendants expressly precluded claims for additional compensation for different conditions only as to visually observable surface conditions. Defendants defined the Scope of Work by the amounts of waste and quantities of waste described in the RFP. There is no language limiting ITC's right to rely on the accuracy or completeness of the RFP data.

■ Based on an analysis of the record as to the surrounding circumstances, this court concludes that ITC was not in as good a

position as defendants to assess subsurface conditions or the sufficiency of the data provided. As the court held in *Lonergan,* if the owner is in a better position than the contractor to assess the site conditions, and if there is language in the contract that will justify the court in concluding that the parties intended it, the parties can place on the owner the risk of unexpected site conditions, even in a lump sum contract. *Lonergan,* 104 S.W. at 1066; *see also, Chapman & Cole v. Itel Container,* 865 F.2d 676 (5th Cir.1989), *cert. denied,* 493 U.S. 872, 110 S.Ct. 201, 107 L.Ed.2d 155 (the parties have the right to allocate the risks among themselves, even in a "turnkey" contract).

### F. The Jury's Responses to the Questions

■ Under the Texas cases, if under the contract the parties intended to place responsibility for inaccurate site information on the owner, the contractor still cannot recover unless it proves that the owner made a positive assertion; that was materially false; upon which the contractor justifiably relied, and that the contractor in fact made no independent investigation. *Shortall,* 114 S.W.2d at 542. The jury was asked in Questions 1 and 2 whether ITC had proven each of these elements.

ITC presented evidence at trial from which a reasonable jury could conclude, and this jury did conclude, that the data in the RFP was so inaccurate as to the quantity and quality of the wastes at the Motco Site that the project was a completely different job than the one which ITC bid. ITC presented evidence at trial that the parties intended that ITC would rely on the RFP data in bidding and performing the work. Rudy Novak, Earl Robert White, and Murray Hutchinson all testified at trial that ITC relied on this information in preparing the bid. Rudy Novak, who prepared the bid design from which the cost estimate was derived, testified that in preparing his design, he relied upon the fact that Monsanto had removed the language precluding later cost adjustments and that the Scope of Work continued to be defined by the information on waste quantity and quality. (TR. 150:4–152:13).

Murray Hutchinson, the Chief Executive Officer of ITC, who had final authority for determining the bid price, testified that he had also relied on the removal of the language which would have required ITC to accept the risk of unquantifiable variances. (TR. 2341:18—2343:21). Only after months of work at the Site did ITC learn that the RFP data was wrong. (TR. 303:16–23, 2358:23–2360:1).

In answering Question 1 in the affirmative, the jury found that the information provided by defendants in the RFP was inaccurate. The evidence was sufficient to support this answer. Based on the evidence presented at trial, a reasonable jury could conclude that ITC was entitled to, and did, rely on defendants' representations as to Site conditions in the RFP. Texas law does not preclude ITC from claiming that the false information breached defendants' contract with ITC. The jury's findings as to Questions 1 and 2 were not unreasonable or immaterial.

### G. Estoppel

■ Defendants argue that ITC was estopped as a matter of law from complaining about any alleged misrepresentations in the RFP. Quasi-estoppel "precludes a party, with knowledge of the facts, from taking a position inconsistent with his or her former position to the disadvantage or injury of another." *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.,* 817 S.W.2d 160, 164 (Tex. App.—Houston [14th Dist.] 1991, no writ); *Stimpson v. Plano Independent School District,* 743 S.W.2d 944, 946 (Tex.App.—Dallas 1987, writ den'd). This court has already concluded that ITC did not assume the risk of discrepancies in the RFP by submitting a bid or by conducting a limited inspection of visually observable Site conditions and taking a few samples. ITC's bid and inspection are not inconsistent with its assertion that the misstatements as to the Site conditions breached the contract and entitled it to damages. Based on the evidence presented at trial, the jury's answer to Question 11 was not unreasonable.

### VI. Fraud and Punitive Damages

■ Defendants argue that the evidence is insufficient to support the jury's findings

**1128**

that defendants' representations in the RFP were fraudulent and that punitive damages should be imposed. To recover for fraudulent misrepresentation under Texas law, a plaintiff must prove that: (1) a material representation was made; (2) it was false; (3) when the speaker made the representation, he knew it was false or was reckless with regard to the veracity of the statement; (4) the speaker intended to induce reliance by the plaintiff; (5) the plaintiff did rely on the statement; and (6) the plaintiff suffered injury. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983).

■ No evidence was presented at trial that, at the time defendants provided the data on the Site conditions to ITC, defendants knew that the information was false or misleading. The evidence at trial was summarized by ITC's trial counsel as follows:

[t]he evidence establishes, ladies and gentlemen, I believe, if we examine it—it establishes there was a reckless disregard for the truthfulness of the data in the RFP. I do not believe that the evidence establishes that there was an actual intent to commit fraud at that time or that there was actual knowledge of the seriousness of the error, but, rather, that the gentleman who prepared this data was looking at the world through rose-colored glasses and hoping upon hope that this cost-effective solution upon which this RFP was dependent would work out.

(TR. 4255–56). This court finds that the evidence was insufficient to support the jury's finding that defendants acted recklessly as to the veracity of the data in the RFP.

■ In the context of a claim for fraud, "reckless" means "a state or quality of wanton disregard of the rights of others, or a conscious indifference to the results which may follow as a consequence of one's acts." *Stone v. Lawyers Title Ins. Corp.,* 537 S.W.2d 55, 71–72 (Tex.App.—Corpus Christi 1976), *aff'd in part, rev'd on other grounds,* 554 S.W.2d 183 (Tex.1977). Under *Trenholm,* a statement is made recklessly when the speaker knows that he does not have sufficient information or basis to support the representation. 646 S.W.2d at 933; *see also Group Hospital Services, Inc. v. Daniel,* 704

S.W.2d 870, 874–75 (Tex.App.—Corpus Christi 1985, no writ) (finding that a statement was made recklessly, but did not rise to the level of conscious indifference necessary for a punitive damages award).

■ Under Texas law, recklessness includes "essential characteristics of gross negligence, and indicates an entire want of care sufficient to raise the belief or presumption that the act or omission complained of was the result of conscious indifference to the rights, welfare, or safety of the person or persons affected by it." *City of San Antonio v. Schneider,* 787 S.W.2d 459, 465 (Tex.App.—San Antonio 1990, *writ den'd*) (citing *Napier v. Mooneyham,* 94 S.W.2d 564, 567–68 (Tex.Civ.App.—Eastland 1936, writ dism'd)). In *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981), the Texas Supreme Court stated that:

"Heedless and reckless disregard" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the persons affected by it. As discussed above, "heedless and reckless disregard" and "gross negligence" are synonymous terms....

616 S.W.2d at 920.

In *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994), the Texas Supreme Court considered the legal sufficiency of evidence to support a finding that an insurer, liable for bad faith in denying the plaintiff benefits under an insurance contract, acted with "heedless and reckless disregard" for the plaintiff's rights. The Court reversed the jury's finding of recklessness and the award of punitive damages, holding that the evidence was insufficient to show that the defendant had an actual subjective awareness that the plaintiff would probably suffer serious injury because of the defendant's conduct. *Moriel,* 879 S.W.2d at 26.

■ In *Moriel,* the Texas Supreme Court discussed the requirements for gross negligence under Texas law, reviewing a jury verdict finding that the defendant had acted

"with heedless and reckless disregard." 879 S.W.2d at 25. Texas case law often equates reckless conduct with grossly negligent conduct. *See, e.g., Burk Royalty Co.,* 616 S.W.2d at 920; *Schneider,* 787 S.W.2d at 465. The conscious indifference standard analyzed in *Moriel* is also the standard for recovering punitive damages for fraud under Texas law. *Trenholm,* 646 S.W.2d at 933; *Daniel,* 704 S.W.2d at 875.[2]

In *Moriel,* the Texas Supreme Court stated in relevant part as follows:

> The requirement of conscious indifference, which our law requires, is superfluous unless it requires proof that the defendant had actual subjective knowledge of an extreme risk of serious harm.... Determining whether an act or omission involves extreme risk or peril requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight.... If somebody has suffered grave injury, it may nevertheless be the case that the behavior which caused it, viewed prospectively and without the benefit of hindsight, created no greater danger. In such a case, punitive damages are not appropriate.

879 S.W.2d at 22–23. The Texas Supreme Court summarized the definition of gross negligence as follows:

> (1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

*Id.* at 23.

After a careful review of the trial record in this case, the parties' submissions, and the applicable authority, this court concludes that there is insufficient evidence to support the jury's finding of fraud.

■ As noted above, ITC did not present evidence that defendants had actual knowledge in 1987 that the information provided in the RFP was false. Rather, ITC claimed that defendants exhibited a reckless disregard for the veracity of the information in the RFP at the time the information was provided to ITC. Earl Robert White, ITC's toxicology expert, testified that the waste information data in the RFP was incorrect and that the erroneous RFP must have been the result of a "reckless disregard for the actual facts." (TR. 812–813). However, a legal conclusion of an expert, based on conjecture, is insufficient to support a jury's verdict. *Genmoora Corp. v. Moore Business Forms, Inc.,* 939 F.2d 1149, 1163 (5th Cir. 1991); *Nichols Const. Corp. v. Cessna Aircraft Co.,* 808 F.2d 340, 349 (5th Cir.1985).[3]

The great weight of the evidence presented at trial established that defendants were not reckless in assembling and transmitting the information in the RFP. Dean Danzer, a chemical engineer at Monsanto, testified that he assembled the technical information provided in the RFP. (TR. 3315:5–6). Danzer testified at length as to the sources of the information provided in the RFP and the care with which he assembled that information. (TR. 3334—3380). Danzer had ten

---

**2.** Although *Moriel* was a bad faith insurance case, the decision represents a substantial clarification of the Texas gross negligence standard that applies outside the bad faith insurance context. The court emphasized in its revised opinion that gross negligence in the context of insurance is *no different from gross negligence in any other context."* *Moriel,* 879 S.W.2d at 23; *Strahan v. Davis,* 872 S.W.2d 828, 834 (Tex.App.—Waco 1994, writ ref'd). *See also, Boorhem–Fields v. Burlington Northern,* 884 S.W.2d 530, 537 (Tex.App.—Texarkana 1994, n.w.h.) (applying *Moriel's* subjective conscious indifference standard to a tort and breach of contract suit arising from a train wreck); *Williams Dist. Co. v. Franklin,* 884 S.W.2d 503, 512 (Tex.App.—Dallas

1994, n.w.h.) (applying *Moriel's* gross negligence standard in a personal injury tort suit).

**3.** ITC argues that the jury's verdict is further supported by handwritten notes made on documents by Monsanto's expert, Richard Ross. However, Richard Ross testified that he made these notes at the time that Joseph Santoleri was retained by Motco. (TR. 3702:20–21). Joseph Santoleri testified that he was retained in June 1992. (TR. 3184:3–4). Richard Ross's after-the-fact notes do not support a jury's finding that Monsanto was reckless as to the veracity of the information in the RFP at the time that the RFP was prepared.

years of experience with the Motco Site. (TR. 3480:14–20). He believed the waste data in the RFP to be accurate as described. The information contained in the RFP came from remedial investigations performed by two EPA contractors as well as an independent investigation contracted by defendants. (TR. 3322–24, 3334–35). The EPA had hired Black & Veatch in 1981 and 1982 to conduct a remedial investigation at the Motco Site, (TR. 3319–20), and had retained $CH_2M$ Hill to do an additional remedial investigation to fill in some of the data gaps in the earlier Black & Veatch investigation. (Tr 3321–22). Defendants had hired Woodward Clyde Consultants to conduct an additional remedial investigation at the Motco Site. (TR. 3322–24). Danzer had assembled this information, summarized it in the RFP, and had made the underlying studies available to ITC.

Determining the credibility of a witness is, of course, exclusively within the province of the jury. *See Grizzle,* 14 F.3d at 266 (quoting *Boeing,* 411 F.2d at 375). However, ITC presented no competent evidence to refute Danzer's testimony as to the care and detail taken in assembling and summarizing the data presented in the RFP. This court concludes that the facts and inferences raised by the evidence at trial overwhelmingly support a finding that defendants were not reckless as to the veracity of the Site and waste data in the RFP. *Roberts,* 14 F.3d at 1078.

▮▮▮ ITC argues that the jury's fraud verdict should be sustained because it presented evidence at trial that defendants made a promise of future performance with an intent not to perform. ITC cites the testimony of Ken Kettler, Monsanto's contract manager, (Docket Entry No. 406, Exhibit D), as to defendants' understanding that the Change Clause in the Remediation Contract covered unexpected waste conditions or amounts, and its alleged intent not to pay such claims. (*Id.,* pp. 271–73). Kettler's testimony, however, did not establish that in 1988, defendants did not intend to comply with the Changes Clause in the Contract. Rather, the dispute between the parties, described in Kettler's testimony, was whether the waste characteristics ultimately discovered at the Motco Site required a cost adjust-

ment under the Contract. (*Id.,* p. 274). A later dispute between the parties as to the legal effect of a contract term cannot be the basis for a fraud claim. *See, Crim Truck & Tractor v. Navistar Int'l,* 823 S.W.2d 591 (Tex.1992) (absent evidence that a party entered into a contract with no intention of performing, a failure to perform the terms of a contract is a breach of contract, but not a tort); *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986) (a failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made); *Int'l Printing Pressmen & Assistant's Union v. Smith,* 145 Tex. 399, 198 S.W.2d 729, 735–36 (Tex.1946).

Additionally, the instructions to the jury expressly limited the jury's consideration of fraud to the allegation that there had been misrepresentations of BTUs, viscosities, or quantities of waste in the RFP. In the Instruction for Question 3, the jury was instructed, without objection by ITC relevant to this point, that:

> IT Corporation has also alleged that Monsanto and Motco trust committed fraud in providing materially false information about the BTUs, viscosities or quantities of waste in the RFP.

The only fraud about which the jury was instructed related to false information about the BTUs, viscosities, or quantities of waste in the RFP. An alleged promise of future performance made with an intent not to perform is immaterial to the jury's answer to Question 3.

▮▮▮ This court also finds that the evidence in this case does not meet the *Moriel* threshold injury test. In *Moriel,* the Texas Supreme Court held that in order to serve as the basis for punitive damages, the injury resulting from the defendants' acts must be qualitatively different from damages that ordinarily or generally arise out of a breach of contract. *Moriel,* 879 S.W.2d at 23–24. The Court noted that damage accompanies the breach of any contract, but is not considered punishable, "even if the breach is intentional." *Id.* at 24. Only certain kinds and degrees of harm justify punitive as well as actual damages:

Some consequential injuries may satisfy the "independent and qualitatively different" test for punitive damages. For example, if an insured requires medical treatment, yet her insurer denies coverage in bad faith with full knowledge of the danger to the insured, then the insured will probably suffer serious injury not ordinarily associated with mere breach of contract. *Id.*

The *Moriel* Court held that punitive damages are only available if a plaintiff has alleged and proven that the defendant was actually aware of an "extreme risk—some genuine and unjustifiable likelihood of serious harm to [plaintiff] that was independent and qualitatively different from the inconvenience of an unreasonable delay in payment." *Moriel*, 879 S.W.2d at 25–26. In *Moriel*, the Texas Supreme Court held that the plaintiff had not met that burden. *Id.*

There is no legally sufficient evidence in this case that defendants were subjectively or actually aware, at the time the RFP was issued in 1987, of any extreme risk of serious harm to ITC independent of or qualitatively different from the economic harm allegedly resulting from the claimed breach of contract. Defendants did not act recklessly, did not commit fraud, and cannot be liable for punitive damages.

This court concludes that the jury's finding that defendants committed fraud was not supported by sufficient competent evidence. The court concludes that ITC failed to establish that defendants were consciously indifferent towards the veracity of the information in the RFP as to the waste characteristics and quantities at the Site. This court also finds that there is an inadequate basis for the imposition of punitive damages. Therefore, this court sets aside the jury's verdict as to Questions 3, 14, and 15.

## VII. Negligent Misrepresentation

 Texas law applies a two-year statute of limitations to negligent misrepresentation claims. *Kansa Reinsurance Co., Ltd. v. Congressional Mortg. Corp. of Texas,*

20 F.3d 1362, 1371 (5th Cir.1994); *Sioux Ltd. Securities Litigation v. Coopers & Lybrand,* 914 F.2d 61, 63–64 (5th Cir.1990). The Fifth Circuit recently reaffirmed that, under Texas law, a cause of action for negligent misrepresentation accrues at the time that the misrepresentation is made. *Kansa Reinsurance,* 20 F.3d at 1371–73. The discovery rule, which is applicable to causes of action for fraud, does not apply to causes of action for negligent misrepresentation. *Id.* at 1372.

 It is undisputed that defendants issued the RFP to ITC on May 20, 1987, and issued the revised RFP in July 1987. ITC's cause of action for negligent misrepresentation based on information in the RFP therefore accrued on May 20, 1987 or, at the latest, in July 1987. Applying the Texas statute of limitations, the limitations period for ITC's claim expired in May or July 1989. ITC filed this suit on December 4, 1991. ITC's suit for negligent misrepresentation is therefore time-barred. The jury's answer to Question 5 is set aside as immaterial. ITC is not entitled to any recovery as a matter of law on ITC's claim for negligent misrepresentation.[4]

## VIII. Damages for Breach of Contract

Defendants argue that the jury's answer to Question 13 should be set aside because the question erroneously submitted an incorrect measure of damages for breach of contract. Defendants contend that the measure of damages presented to the jury in Question 13 is for recovery in *quantum meruit.* Defendants maintain that ITC waived any rights to recovery in *quantum meruit* by failing to raise that claim in the pretrial order. *See Valley Ranch Dev. Co., Ltd. v. F.D.I.C.,* 960 F.2d 550, 554 (5th Cir.1992).

 Under Texas law, if a defendant has committed a breach of contract serious enough to excuse the plaintiff from further performance, the plaintiff may choose between suing for the benefit of the bargain or for restitution. *Coon v. Schoeneman,* 476 S.W.2d 439, 441 (Tex.Civ.App.—Dallas 1972,

---

4. Defendants have asserted other arguments to set aside the jury's verdict as to fraud, negligent misrepresentation, and punitive damages.

Based on this court's prior rulings, this court need not reach defendants' alternative grounds for relief on these issues.

writ ref'd n.r.e.). Restitution is normally pursued as an action for *quantum meruit.* *Id.; see also, Angelo Broadcasting v. Satellite Music Network, Inc.,* 836 S.W.2d 726, 731 (Tex.App.—Dallas 1992, writ denied). A plaintiff may pursue both expectation damages and restitution by alternative pleadings and make his election between them at trial. *Angelo Broadcasting,* 836 S.W.2d at 731.

In *United States for Use of M–CO Const. v. Shipco General,* 814 F.2d 1011 (5th Cir. 1987), the Fifth Circuit noted that a non-breaching plaintiff may claim rescission under Texas law. *Id.* at 1015. The appropriate damages measure for a rescinded contract is restitution. *Id.* Defendants correctly point out that *Shipco* expressly relies on Texas *quantum meruit* cases as the basis for a rescission suit. Regardless of what term is used—rescission or *quantum meruit*—it is undisputed that restitution is one appropriate damage measure for a breach of contract claim. *Beeman v. Worrell,* 612 S.W.2d 953, 957 (Tex.Civ.App.—Dallas 1981, no writ); *Coon,* 476 S.W.2d at 441; *see also Truly v. Austin,* 744 S.W.2d 934, 936 (Tex.1988).

■ In the Pretrial Order, ITC asserted claims for breach of contract and rescission. (Docket Entry No. 283, ¶¶ 28, 123). ITC requested damages totalling $55.8 million as actual damages. (*Id.*). ITC did not explicitly state whether this sum was for a cause of action for restitution or for *quantum meruit.* However, in the Pretrial Order, defendants acknowledged that ITC claimed recovery under *quantum meruit.* (*Id.,* ¶ 130). This court concludes that ITC did not waive its right to pursue its restitution claim.

■ Defendants argue that a plaintiff who sues for restitution on a fixed-price contract cannot as a matter of law recover more than the contract price. *See* 3 E. Allan Farnsworth, *Contracts* § 12.20 at 311–12 (1990). Although some jurisdictions apply a maximum recovery rule for restitution claims on fixed-price contracts, there is no consensus among the courts or the leading commentators that such a maximum recovery rule applies. *Id.; see also* Arthur Linton Corbin,

5 *Corbin on Contracts* § 1113 at 602 (1964) ("[e]xcept in cases where the plaintiff's performance has gone so far as to result in the creation of a liquidated contract debt, the generally prevailing rule is that the plaintiff's recovery of the value of the consideration received by the defendant is neither measured by nor limited by the contract price").[5] Defendants have failed to cite, and this court's independent research has not found, Texas authority requiring or applying a maximum recovery rule.

Defendants' reliance on *Coon v. Schoeneman,* 476 S.W.2d at 441, is misplaced. The court in *Coon* stated the well-settled rule that where a contractor has completed an entire job or a separable part of a job, the contractor may only recover as damages the contract price associated with the completed work. *Id.; see also* 5 Corbin § 1110 at 585. It is undisputed that ITC did not complete the contract performance at the Motco Site or any severable portion of the contract work. Moreover, the *Coon* court stated that where a defendant prevents plaintiff's performance, as ITC claims here, a plaintiff is entitled to full restitution. *Coon,* 476 S.W.2d at 442. This court finds no Texas authority allowing a court to cap ITC's recovery at the contract price.

■ Defendants next argue that insufficient evidence was presented at trial to support the jury's award of $52,823,356.53. Under Texas law, a plaintiff suing for restitution is entitled to recover " 'the full value of the work done' or 'the reasonable [market] value of the labor and materials [it] has put into the building in accordance with the contract, whether the result has any value to the owner or not.' " *Shipco,* 814 F.2d at 1011 (quoting *Beeman,* 612 S.W.2d at 957).

By giving a judgment for restitution of value received by the defendant, the court is trying to put the plaintiff in a position as good as that occupied by him before the contract was made, at least so far as that result will be brought about by requiring the defendant to pay the reasonable value of what he may have received from the plaintiff by way of part performance.

---

5. Texas courts often recognize *Corbin on Contracts* as the authoritative voice on the law of

restitution. *See, e.g., Angelo Broadcasting,* 836 S.W.2d at 731; *Beeman,* 612 S.W.2d at 957.

5 Corbin § 1112 at 598–99; *see also Dill v. Helms,* 468 S.W.2d 608, 611 (Tex.Civ.App.—Waco 1971, writ ref'd n.r.e.) (after the owner breached, the contractor could recover the "value of the labor and material expended by [contractor] on the house"); *Texas Assoc. v. Joe Bland Const. Co.,* 222 S.W.2d 413, 422 (Tex.Civ.App.—Austin 1949, writ ref'd n.r.e.) (when defendant breached and the suit was in quantum meruit, the jury verdict was not excessive where the contractor's bookkeeper's testimony showed that the cost to the contractor of the job was slightly more than the amount awarded by the jury).

▪ Under Texas law, ITC was entitled to recover the reasonable value of ITC's work at the Motco Site. Defendants argue that the evidence only supports ITC's recovery of damages totaling $16,949,487.78, the "cost" of the labor and materials provided by ITC, less the payments already made by defendants.

Harry Soose, ITC's comptroller for construction and remediation work, testified as to ITC's damages claim. (TR. 1624–1644; Docket Entry No. 409, Exhibit 11). Soose testified that ITC incurred labor costs of $9,776,550.58 plus overtime costs of $658,740.51 (TR. 1628, ITC Exhibit No. 1394). Soose also testified as to costs of $3,606,935.29 and $118,573.29 for employee benefits associated with regular and premium labor, respectively. (TR. 1637, ITC Exhibit No. 1394). Soose testified to materials costs incurred by ITC of $18,479,183.19. (TR. 1631, ITC Exhibit No. 1394). Soose further testified that ITC incurred costs of $3,935,747.55 in hiring subcontractors. (TR. 1631, ITC Exhibit No. 1394). Defendants appear to argue that these are the only damage elements for which ITC is entitled to recover. However, Soose identified other elements of ITC's damages claim which the jury was entitled to consider as part of the reasonable value of the labor and materials provided by ITC. Testimony as to the actual dollar amounts for ITC's costs was established through Plaintiff's Trial Exhibit 1394.

Soose testified that ITC incurred costs to rent equipment for the project and incurred depreciation costs on equipment ITC already owned, for a total of $3,994,103.67. (TR. 1628–29). ITC also incurred property taxes of $868,549.05 on the equipment ITC used on the project. (TR. 1631). Soose testified to a separate itemized cost of $4,709,807.42 for depreciation on the equipment used at the Motco Site. (TR. 1632). Soose testified that the "depreciation expense" in the depreciation category was for different equipment from the depreciation expense included in the equipment category. (TR. 1630, 1632–34).

Soose further testified as to overhead of $6,961,145.32 and general and administrative ("G & A") expenses of $6,793,346.92. (TR. 1637–38). These expenses covered the costs of the business unit and ITC's executive functions. (*Id.*). Soose testified that ITC incurred capital cost of money expenses on assets within the overhead and G & A categories of $350,600.66 and $328,874.92 respectively (TR. 1636). ITC also incurred interest costs of $6,630,568.86 to finance the construction of the waste incineration units for the Motco Site. Finally, Soose testified that ITC incurred "analytical" costs of $2,300,093.90 for sampling and reporting costs involved with the remediation. (TR. 1640).

▪ All of these costs, established by Soose's testimony, relate to "the reasonable value of what defendants may have received from the plaintiff by way of part performance." 5 Corbin § 1112 at 598–99. The court instructed the jury to consider reasonable "labor" and "materials" costs incurred by ITC. This is treated under Texas law as equivalent to "the full value of the work done." *Shipco,* 814 F.2d at 1011. Both phrases are used in the Texas cases. If anything, the form of the instruction understated the elements of potential damages, and is not a basis for setting aside the jury's award.

▪ Soose's testimony did, however, identify one element of damages for which ITC is not entitled to recover as a matter of law. Soose testified that he included in the damages calculation a 10 percent "fee," representing the profit which ITC expected. (TR. 1639–40, 1642). ITC elected to pursue a restitution remedy for defendants' breach of contract. (TR. 4123–47, 4154). In electing to sue for restitution, ITC waived any

right to recovery for projected profits on the contract. ITC is only entitled to recover the reasonable value of the expenditures ITC actually made in remediating the Motco Site. *Beeman,* 612 S.W.2d at 957.

Soose testified that he included a fee of $5,990,268.27 in the damages calculation. (Docket Entry No. 409, Attachment 11). Soose further testified that the $2,300,093.90 damage element for "analytical" included a 10 percent fee calculation. (TR. 1642). The "analytical" damages element was overstated by $230,009.39, or 10 percent. (*Id.*). Soose's damages calculation was therefore overstated by a total of $6,220,277.66. Subtracting this number from the sum of the elements which Soose testified were due to ITC yields a total recoverable damages claim of $49,598,212.99.[6]

■■■ Defendants are also incorrect in arguing that ITC is precluded from recovery because ITC did not present evidence of the causal link between defendants' breach and the ITC's damage claims. ITC presented evidence that the expenditures claimed by ITC were incurred in connection with ITC's remediation of the Motco Site. To recover for restitution, ITC only need demonstrate that its costs were reasonably incurred in performing the contract, not that the costs were causally linked to defendants' breach of that contract. *See, e.g., PIC Realty Corp. v. Southfield Farms, Inc.,* 832 S.W.2d 610, 616 (Tex.Civ.App.—Corpus Christi 1992, no writ).

Because Soose's testimony was the only evidence ITC presented as to damages, the maximum award for restitution for breach of contract that is supported by sufficient evidence is $49,598,212.99.

## IX. The 1990 Release

On September 26, 1990, ITC signed a Settlement Agreement releasing approximately $8.9 million of damage claims asserted against defendants as of that date. Despite this release, the $8.9 million, less the $3.1 million that defendants actually paid to ITC in settlement payments under the Agreement, was included in ITC's damages in this case. Defendants argue that the 1990 Settlement Agreement should be enforced and ITC's damage award should be reduced by $5.8 million. ITC maintains that the 1990 Agreement should not be enforced because the release was induced by fraud. ITC claims that at the time of the 1990 release, Motco was still relying on the fraudulent misrepresentations made in the 1987 RFP.

■■■ A release, like any other contract, may be set aside if it is induced by fraud. *Schmaltz v. Walder,* 566 S.W.2d 81, 84 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Brady v. Johnson,* 512 S.W.2d 359, 361 (Tex.Civ.App.—Austin 1974, no writ). A party seeking to invalidate a release on the basis of fraud must establish "each of the six (6) elements of fraud in the inducement of the execution of the release." *Schmaltz,* 566 S.W.2d at 84; *Neuhaus v. Kain,* 557 S.W.2d 125, 136 (Tex.Civ.App.— Corpus Christi, 1977, writ ref'd n.r.e.).

ITC argues that this court should decline to enforce the 1990 release because ITC was still relying on defendants' alleged 1988 fraud. This court has already determined that insufficient evidence existed to support the jury's verdict that defendants defrauded ITC in 1988. The 1990 Agreement must be enforced as a matter of law. ITC released defendants from $8.9 million in claims for costs incurred as of 1990 in remediating the Motco Site. The damages must be reduced by $5.8 million—$8.9 million less the $3.1 million that defendants already paid ITC for the release.

## X. Pre–Judgment Interest

■■■ ITC does not seek to recover under the changes clause of the contract. Nor does ITC seek recovery for what other courts have termed "extras" under a fixed price contract. Extra work is work arising outside of and independent of the contract; something not required in its performance. *City of Houston v. L.J. Fuller, Inc.,* 311 S.W.2d at 290; *see also, Shortall,* 114 S.W.2d at 540

---

6. ITC's Exhibit No. 1394 tabulated the cost elements to which Soose testified. The sum of the cost elements is $75,503,089.40. Soose testified that Motco made payments to ITC totalling $19,- 684,598.75. Subtracting these payments and the $6,220,277.66 by which Soose's testimony overstated the cost elements from $75,503,089.40 results in a total of $49,598,212.99.

(claim for expenses for tunneling because the ground conditions were different than anticipated in a lump sum contract was not a claim for "extra" work). ITC's recovery is for a sum not ascertainable by the contract documents.

This court has determined that ITC is entitled to $43,738,212.99 ($49,598,212.99 less $5,800,000) as damages on its breach of contract claim. The Remediation Contract at issue in this case does not contain an ascertainable sum for breach of contract purposes. Article 6.5 of the Remediation Contract, relied upon by defendants, sets out a schedule of permissible cost items that can be charged when the Trustee elects to have changes to the contract made on a cost-plus basis. (Defendants' Ex. 162).

Under Texas law, if a contract does not contain an ascertainable sum, a plaintiff is entitled to pre-judgment interest at the post-judgment rate at the time of judgment, in accordance with Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, § 2 (West Supp.1994). *See Enterprise–Laredo Associates v. Hachars, Inc.,* 839 S.W.2d 822, 839 (Tex.App.—San Antonio 1992, *writ den'd per curiam,* 843 S.W.2d 476 (1992)); *Rio Grande Land & Cattle v. Light,* 758 S.W.2d 747, 748 (Tex.1988). Article 5069–1.05, § 2 provides that interest is to be compounded annually. *Guest v. Phillips Petroleum Company,* 981 F.2d 218, 223 (5th Cir.1993). It is undisputed that the applicable rate of interest under Article 5069–1.05, § 2 is 10 percent.

 ITC presented this court with an affidavit establishing the total pre-judgment interest due at a rate of 10 percent compounded *daily.* The appropriate measure of pre-judgment interest for this suit is 10 percent compounded annually. *Guest,* 981 F.2d at 223. ITC is ORDERED to submit an affidavit reflecting the correct interest owed within 10 days of the date this order is entered.

## XI. Conclusion

Sufficient evidence was presented at trial to support the jury's verdict that defendants breached the contract with ITC, and the jury's verdict is not precluded by the Texas case law on lump sum contracts. However, insufficient evidence was presented to support the jury's conclusion that defendants defrauded ITC or that punitive damages could be imposed. The court therefore sets aside the jury's verdict as to Questions 3, 14, and 15. The jury's answers to the questions as to negligent misrepresentation (Question 5), and the 1990 Release (Question 12) are set aside as a matter of law.

As a matter of law, the maximum recovery to which ITC is entitled on the breach of contract claim is $49,498,212.99. This damage award is further reduced by $5,800,000 because of the 1990 Release. ITC is therefore entitled to final judgment in the amount of $43,698,212.99, plus interest, attorneys' fees, and costs. ITC is entitled to pre-judgment interest at the rate of 10 percent, compounded annually.

ITC is ORDERED to submit a proposed final judgment incorporating the rulings of this court within 14 days from the date this order is entered.